258 N.J. Super. 167 (1992)
609 A.2d 440
DIAMOND SHAMROCK CHEMICALS COMPANY, PLAINTIFF-APPELLANT,
v.
THE AETNA CASUALTY & SURETY COMPANY; THE LONDON MARKET INSURERS: ACCIDENT AND CASUALTY COMPANY OF WINTERTHUR; ALBA GENERAL INSURANCE COMPANY LTD.; ALLIANZ INTERNATIONAL INSURANCE COMPANY LTD.; ANDREW WEIR INSURANCE COMPANY LTD.; ANGLO-FRENCH INSURANCE COMPANY LTD.; ARGONAUT NORTHWEST INSURANCE COMPANY LTD.; ASSICURAZIONI GENERALI S.P.A. (U.K. BRANCH); AVIATION AND GENERAL INSURANCE COMPANY LTD.; BERMUDA FIRE & MARINE INSURANCE COMPANY LTD.; BISHOPSGATE INSURANCE LIMITED; BRITISH AVIATION INSURANCE COMPANY LTD.; BRITISH NATIONAL INSURANCE LTD.; BRITISH NATIONAL INSURANCE COMPANY LTD. AS SUCCESSOR TO NORTH ATLANTIC INSURANCE COMPANY LTD.; BRITTANY INSURANCE COMPANY LTD.; BRYANSTON INSURANCE COMPANY; CAMOMILE UNDERWRITING AGENCIES LTD. ON BEHALF OF COMPAGNIE D'ASSURANCES MARITIMES ARIENNES ET TERRESTRES; CITY GENERAL INSURANCE COMPANY LTD.; CNA REINSURANCE OF LONDON LTD.; COMPAGNIE EUROPEENE D'ASSURANCES INDUSTRIELLES S.A.; COMPANHIA DE SEGUROS IMPERIO; COMPANIA AGRICOLA DE SEGUROS, S.A.; DART INSURANCE COMPANY LTD.; THE DOMINION INSURANCE COMPANY LTD.; DOMINION INSURANCE COMPANY LTD. ON BEHALF OF THE ANGLO-SAXON INSURANCE ASSOCIATION LTD.; DOMINION INSURANCE COMPANY LTD. ON BEHALF OF THE BRITISH MERCHANTS INSURANCE COMPANY LTD.; DOMINION INSURANCE COMPANY LTD. ON BEHALF OF LONDON AND EDINBURGH INSURANCE COMPANY LTD.; DOMINION INSURANCE CO. LTD. ON BEHALF OF THE ROYAL SCOTTISH INSURANCE CO.; DOMINION INSURANCE COMPANY LTD. ON BEHALF OF THE TRENT INSURANCE COMPANY LTD.; DOMINION INSURANCE COMPANY LTD. ON BEHALF OF THE VANGUARD INSURANCE CO. LTD.; DOMINION INSURANCE COMPANY LTD. ON BEHALF OF THE WORLD MARINE AND GENERAL INSURANCE CORPORATION; DRAKE INSURANCE COMPANY LTD.; ECONOMIC INSURANCE COMPANY LTD.; THE EDINBURGH ASSURANCE CO. NUMBER 2 ACCOUNT; EL PASO INSURANCE COMPANY LTD.; ENGLISH AND AMERICAN INSURANCE COMPANY LTD.; EXCESS INSURANCE COMPANY LTD.; FIDELIDADE GRUPO SEGURADOR; FOLKSAM INTERNATIONAL INSURANCE COMPANY (UK) LTD.; HEDDINGTON INSURANCE COMPANY (UK) LTD.; HELVETIA ACCIDENT SWISS INSURANCE COMPANY; HIGHLANDS UNDERWRITING AGENCY ON BEHALF OF HIGHLANDS INSURANCE CO.; HIGHLANDS UNDERWRITING AGENCY ON BEHALF OF AMERICAN HOME ASSURANCE CO.; HIGHLANDS UNDERWRITING AGENCY ON BEHALF OF LONDON AND EDINBURGH INSURANCE CO.; INSCO LTD.; LA ROYAL BELGE GROUP; LATINO AMERICANA DE REASUGURSOS S.A.; LEXINGTON INSURANCE COMPANY LTD.; LONDON & EDINBURGH GENERAL INSURANCE COMPANY LTD.; LONDON AND OVERSEAS COMPANY PLC (`A' ACCOUNT); LONDON AND OVERSEAS CO. PLC (`A' ACCOUNT) AS SUCCESSOR TO HULL UNDERWRITERS ASSOCIATION; LOUISVILLE INSURANCE COMPANY LTD.; LUDGATE INSURANCE COMPANY LTD.; MINSTER INSURANCE COMPANY LTD.; MUTUAL REINSURANCE COMPANY LTD.; NATIONAL CASUALTY COMPANY; NATIONAL CASUALTY COMPANY OF AMERICA LTD.; NEW INDIA INSURANCE COMPANY LTD.; ORION INSURANCE COMPANY LTD.; PRUDENTIAL ASSURANCE COMPANY LTD.; RIVER THAMES INSURANCE COMPANY LTD.; SLATER WALKER INSURANCE COMPANY LTD.; SOUTHERN INSURANCE COMPANY LTD. (NOW KNOWN AS THE BOX HILL INVESTMENT LTD.); SOVEREIGN MARINE AND GENERAL INSURANCE COMPANY LTD.; SPHERE INSURANCE COMPANY LTD.; STOREBRAND INSURANCE COMPANY (UK) LTD.; STRONGHOLD INSURANCE COMPANY LTD.; SUMITOMO MARINE & FIRE INSURANCE COMPANY LTD.; SUMITOMO MARINE & FIRE INSURANCE COMPANY (EUROPE) LTD.; ST. KATHERINE INSURANCE COMPANY LTD.; SWISS NATIONAL INSURANCE CO. LTD.; SWISS UNION GENERAL INSURANCE CO.; THE TAISO MARINE & FIRE INSURANCE COMPANY (UK) LTD.; TERRA NOVA INSURANCE COMPANY LTD.; THREADNEEDLE INSURANCE COMPANY LTD.; THE TOKIO MARINE & FIRE INSURANCE (UK) LTD.; TUREGUM INSURANCE COMPANY LTD.; UNITED STANDARD INSURANCE COMPANY LTD.; UNIVERSAL REINSURANCE CORPORATION OF NEW JERSEY AS SUCCESSOR TO BELLEFONTE INSURANCE COMPANY; WALBROOK INSURANCE COMPANY LTD.; WINTERTHUR SWISS INSURANCE COMPANY, WORLD AUXILIARY INSURANCE CORPORATION LTD.; YASUDA FIRE & MARINE INSURANCE COMPANY (UK) LTD.; AIU INSURANCE COMPANY; AMERICAN CENTENNIAL INSURANCE COMPANY; AMERICAN EXCESS INSURANCE COMPANY; AMERICAN HOME ASSURANCE COMPANY; AMERICAN RE-INSURANCE COMPANY; CALIFORNIA UNION INSURANCE COMPANY; COMMERCIAL UNION INSURANCE COMPANY (SUCCESSOR TO EMPLOYERS LIABILITY ASSURANCE CORPORATION LTD.); EMPLOYERS MUTUAL CASUALTY COMPANY; EVANSTON INSURANCE COMPANY; FIREMAN'S FUND INSURANCE COMPANY; FIRST STATE INSURANCE COMPANY; GENERAL REINSURANCE CORPORATION; GIBRALTAR CASUALTY COMPANY; GRANITE STATE INSURANCE COMPANY; THE HOME INSURANCE COMPANY; INSURANCE COMPANY OF NORTH AMERICA (SUCCESSOR TO INDEMNITY INSURANCE COMPANY OF NORTH AMERICA); LEXINGTON INSURANCE COMPANY, LTD.; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.; NORTH STAR REINSURANCE CORPORATION; PACIFIC EMPLOYERS INSURANCE COMPANY; PRUDENTIAL REINSURANCE COMPANY; RANGER INSURANCE COMPANY; ROYAL INDEMNITY COMPANY; UNDERWRITERS AT LLOYD'S LONDON, DEFENDANTS-RESPONDENTS, CROSS-APPELLANTS, AND ARROW LIFE INSURANCE COMPANY (SUCCESSOR TO SLATER, WALKER INSURANCE COMPANY); ASSICURAZIONI GENERALI; ASSICURAZIONI GENERALI S.P.A. (U.K. BRANCH); ASSICURAZIONI GENERALI DI TRIESTE E VENEZIA S.P.A.; ATLANTA INTERNATIONAL INSURANCE COMPANY; BELLEFONTE REINSURANCE COMPANY LIMITED (SUCCESSOR TO BELLEFONTE INSURANCE COMPANY); BELLEFONTE INSURANCE COMPANY (U.K. BRANCH); BRITISH MERCHANTS INSURANCE COMPANY LTD.; BRYANSTON INSURANCE COMPANY LTD.; COMPAGNIE D'ASSURANCES MARITIMES ARIENNES ET TERRESTRES; THE CONTINENTAL INSURANCE COMPANY; DART AND KRAFT INSURANCE COMPANY LIMITED; THE FIDELITY AND CASUALTY COMPANY OF NEW YORK; FRIENDS PROVIDENT LIFE OFFICE (SUCCESSOR TO SOUTHERN INSURANCE COMPANY); GREAT SOUTHWEST FIRE INSURANCE COMPANY; HIGHLANDS INSURANCE COMPANY; IMPERIO COMPANHIA DE SEGUROS; THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA; LA ROYALE BELGE I.R.S.A. D'ASSURANCES; LATINO AMERICANO DE REASUGUROS; LONDON GUARANTEE AND ACCIDENT COMPANY OF NEW YORK; NATIONAL CASUALTY COMPANY OF AMERICA LTD.; NORTH ATLANTIC INSURANCE COMPANY LIMITED; PACIFIC AND GENERAL INSURANCE COMPANY LTD.; REPUBLIC INSURANCE COMPANY; ROYAL SCOTTISH INSURANCE COMPANY LTD.; SECURITY INSURANCE COMPANY OF HARTFORD (SUCCESSOR TO NEW AMSTERDAM CASUALTY COMPANY); SOVEREIGN MARINE & GENERAL INSURANCE COMPANY LTD. `C' ACCOUNT; SOVEREIGN MARINE & GENERAL INSURANCE COMPANY LTD. H.D.N. ACCOUNT; ST. KATHERINE INSURANCE CO. PLC; ST. KATHERINE INSURANCE COMPANY LTD. (NO. 2 ACCOUNT); ST. KATHERINE INSURANCE CO. LTD. (X ACCOUNT); ST. PAUL MERCURY INSURANCE COMPANY; SUMITOMO MARINE AND FIRE INSURANCE COMPANY LTD. (TOKYO); SWISS NATIONAL INSURANCE COMPANY LIMITED (BASLE); SWISS UNION GENERAL INSURANCE CO.; TRANSIT CASUALTY COMPANY; TRENT INSURANCE COMPANY LIMITED; TUREGUM INSURANCE COMPANY; TWIN CITY FIRE INSURANCE COMPANY; UNITED STATES FIRE INSURANCE COMPANY; VANGUARD INSURANCE COMPANY LIMITED, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 24, 1992.
Decided April 6, 1992.
Reargued May 19, 1992.
Decided June 4, 1992.
*176 Before Judges ANTELL, LONG and BAIME.
Michael P. Tierney argued the cause for appellant (Pitney, Hardin, Kipp & Szuch, attorneys; James C. Pitney and Dennis R. LaFiura on the brief; Cahill Gordon & Reindel (Raymond L. Falls, Jr., Leonard A. Spivak, Michael P. Tierney, Thorn Rosenthal and Peter F. Lake) of counsel).
Allan B. Taylor argued the cause for respondent The Aetna Casualty and Surety Company (Connell, Foley & Geiser and Day, Berry & Howard, attorneys; John B. LaVecchia of CF & G and Allan B. Taylor, Thomas J. Groark, Jr., Scott P. Moser, Ruth A. Kurien of DB & H on the joint brief).
Robert J. Bates, Jr. argued the cause for respondents American Re-Insurance Company and American Excess Insurance *177 Company (Phelan, Pope & John, Ltd. and Budd, Larner, Gross, Picillo, Rosenbaum, Greenberg & Sade, attorneys; Robert J. Bates, Jr. and Maryann C. Hayes of PP & J and Carl Greenberg of BLGPRG & S on the joint brief).
Peter I. Sheft argued the cause for respondents London Market Insurers (Sheft & Sweeney, attorneys; Peter I. Sheft, David Holmes and Rosemary A. Juster on the joint brief).
Paul R. Koepff argued the cause for respondents Insurance Company of North America, California Union Insurance Company and Pacific Employers Insurance Company (Mudge, Rose, Guthrie, Alexander & Ferdon and Ribis, Graham, Verdon & Curtin, attorneys; Paul R. Koepff and George A. Pierce of MRGA & F and Thomas R. Curtin of RGV & C on the joint brief).
Stephen D. Cuyler argued the cause for respondents General Reinsurance Company, Gibralter Casualty Insurance Company, North Star Reinsurance Company, Prudential Reinsurance Company, Ranger Insurance Company, Employers Mutual Insurance Company and American Centennial Insurance Company (Cuyler, Burk & Matthews, attorneys; Stephen D. Cuyler and Peter Petrou on the joint brief).
Respondent Home Insurance Company relied on the argument of Stephen D. Cuyler (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Henry Morgan on the joint brief).
Respondent Commercial Union Insurance Company relied on the argument of Stephen D. Cuyler (Griffith & Burr, attorneys; James W. Christie on the joint brief).
Respondent Fireman's Fund Insurance Company relied on the argument of Stephen D. Cuyler (Kunzman, Coley, Yospin & Berstein and Gilberg & Kurent, attorneys; Steven A. Kunzman of KCY & B and K. Thomas Shahriari of G & K on the joint brief).
*178 Respondents National Union Fire Insurance Company of Pittsburgh, PA., American International Underwriters, American Home Assurance Company, Lexington Insurance Company and Granite State Insurance Company relied on the argument of Stephen D. Cuyler (Garrity, Fitzpatrick, Graham, Hawkins & Favetta, attorneys; Antonio D. Favetta on the joint brief). Respondents also filed a separate brief.
Respondents The Hartford Accident & Indemnity Co., First State Insurance Company and Twin City Fire Insurance Co. relied on the argument of Stephen D. Cuyler (Tompkins, McGuire & Wachenfeld, attorneys; Rex K. Harriott on the joint letter-brief).
Respondent Royal Indemnity Co. relied on the argument of Stephen D. Cuyler (Golden, Rothschild, Spagnola & DiFazio, attorneys; Charles W. Miller on the joint letter-brief).
Respondent Evanston Insurance Co. relied on the argument of Stephen D. Cuyler (Wilson, Elser, Moskowitz, Edelman & Dicker, attorneys; Thomas F. Quinn on the joint letter-brief).
Respondent Atlanta International Insurance Co. relied on the argument of Stephen D. Cuyler (Feuerstein, Sachs, Maitlin & Fleming, attorneys; Allan Maitlin on the joint letter-brief).
Smith, Stratton, Wise, Heher & Brennan submitted a brief on behalf of Amicus Curiae Insurance Environmental Litigation Association (Wendy L. Mager on the brief; Wiley, Rein & Fielding (Thomas W. Brunner, Marilyn E. Kerst, Frederick S. Ansel) of counsel).
Lowenstein, Sandler, Kohl, Fisher & Boylan submitted a brief on behalf of Amicus Curiae The American Petroleum Institute, The Chemical Manufacturers Association, CF & I Steel Corporation, International Business Machines Corporation, ICI Americas, Inc., Olin Corporation, Public Service Electric and Gas Company, Sandvik, Inc., and Westinghouse Electric Corporation (Gregory B. Reilly on the brief; Covington & Burling (William H. Allen, William F. Greaney, Kelly Knivila) *179 and Kirkpatrick & Lockhart (Peter J. Kalis, Thomas M. Reiter, James V. Corbelli) of counsel).
Stickel, Koenig & Sullivan submitted a brief on behalf of Amicus Curiae New Jersey State League of Municipalities (Ralph J. Kmiec on the brief).
Hannoch Weisman submitted a brief on behalf of Amicus Curiae USR Industries, Inc., USR Metals, Inc., USR Lighting, Inc., Safety Light Corporation, USR Chemicals, Inc. and U.S. Natural Resources, Inc. (Irvin M. Freilich of counsel; Kevin J. Bruno on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
This appeal and cross-appeal present a myriad of complex questions concerning the construction of a variety of insuring agreements contained in a series of comprehensive general liability insurance policies issued successively over a period of approximately thirty years. Also at issue is the applicability and interplay of standard form "occurrence-based" language and the war risk exclusion to claims arising out of injuries sustained by military personnel who were exposed to Agent Orange while in Vietnam.
Two separate sets of claims are involved in this litigation. The first relates to claims for environmental pollution caused by the release of dioxins and other hazardous chemicals from plaintiff Diamond Shamrock Chemical Company's (Diamond) plant in Newark, New Jersey. Over the years, these hazardous substances migrated to surrounding areas. In response to actions taken by the New Jersey Department of Environmental Protection (DEP), Diamond has agreed to engage in remedial measures designed to eradicate pollution at the plant and nearby properties. Wholly apart from these remediation costs, Diamond is confronted with extensive claims for property damage and bodily injury by residents of the surrounding neighborhoods. A second set of claims emanates from Diamond's *180 participation in the settlement of a class action brought by Vietnam veterans who were exposed to Agent Orange. Diamond was one of the major manufacturers of this herbicide and contributed $23,339,417.36 toward the settlement.
Following a disclaimer, Diamond instituted suit against its primary carrier, Aetna Casualty & Surety Company, and 123 excess providers, seeking to compel them to indemnify it for both sets of losses. After a protracted non-jury trial, the Chancery Division determined that the carriers were not obliged to indemnify Diamond for the claims involving environmental damage and bodily injury caused by the release of dioxins and other hazardous substances. The Chancery Division found that the discharge of these substances did not constitute an "accident" or "occurrence" within the meaning of the insuring agreements and, in some instances, fell within the purview of the pollution exclusion. With respect to the Agent Orange claims, the court determined that the injuries resulted from a single, continuous occurrence that took place in the United States and that the settlement was not excluded by the war risk exception or covered by the foreign risk providers.
While we disagree with certain aspects of the Chancery Division's opinion as to the dioxin claim, we are satisfied that the correct result was reached. We find, however, that the war risk exclusion contained in several of the policies issued by the excess providers barred recovery of Diamond's Agent Orange loss. In that respect, we conclude that the exposure of individuals to Agent Orange and the injuries sustained were the result of a hazard or peril incidental to the military engagement of the United States government in Vietnam and were made more likely and probable by the demands of war. With respect to the excess providers whose policies did not contain a war exclusion, we remand for further proceedings to determine whether their obligation should be reduced by amounts that would have been available under foreign risk policies but for Diamond's late notice. We also modify the award of prejudgment interest. Accordingly, the judgment is affirmed in part and reversed in *181 part, and the matter is remanded to the Chancery Division for further proceedings.

I.
The facts concerning the environmental damage claim differ from those relating to the Agent Orange settlement. Despite some common elements, these claims raise different issues. We thus bifurcate our recital of the facts. We first address the facts surrounding the environmental pollution claim. We then turn to those relating to the Agent Orange settlement.

A.
The salient facts are largely undisputed. Diamond's chemical manufacturing plant was located at 80 Lister Avenue in the Ironbound section of Newark and consisted of approximately 3.4 acres bounded on the north by the Passaic River, on the east by the former Sergeant Chemical Company (which was subsequently purchased by Diamond), at the southwest corner by the Duralak Company property, and on the south and west by the Sherwin-Williams property. The entire area is located in a flood zone.
The property has long been the site of industrial operations. The record discloses that the first manufacturing plant was constructed on the property shortly after the conclusion of the Civil War. The property was subsequently owned and developed by the Lister Agricultural Chemical Company in the early 1900's, and in 1940 was acquired by Kolker Chemical Works, Inc. (Kolker). Agricultural chemical manufacturing was in process by the mid-1940's. The chemicals manufactured or processed at the plant included dichlorodiphenyl trichloroethane (DDT) and the phenoxy herbicides. DDT production began before the end of World War II. Production of phenoxy herbicides commenced in 1948. Although other chemicals were manufactured at the site, DDT and the phenoxy herbicides were the principal products made by Kolker. In March 1951, Kolker *182 was acquired by Diamond Alkali Company, which subsequently became known as Diamond Shamrock Chemical Company.
Although Diamond ceased manufacturing some of the types of chemicals made by Kolker, it continued to produce phenoxy herbicides and DDT until the late 1950's. At that point, DDT production ceased, leaving the phenoxy herbicides as the only products Diamond manufactured at the Lister Avenue plant. Two of the intermediates (products which are converted into another end product) of phenoxy herbicides are 2,4-dichlorophenoxyacetic acid (2,4-D) and 2,4,5-trichlorophenoxyacetic acid (2,4,5-T). Dioxin is an impurity formed as a by-product in the 2,4,5-T process. Agent Orange consists of a mixture of butyl 2,4-D ester and butyl 2,4,5-T ester.
Almost from the day production of the phenoxy herbicides commenced, Diamond's workers experienced a skin disease called chloracne. Chloracne was characterized by Diamond's corporate medical official, Dr. William York, as a "serious ... very disfiguring social disability." It was clear that by June 1955, Diamond, though not certain of the specific cause of the chloracne, was aware that something in its chemical processing to which its workers were exposed resulted in this inflammation. Diamond was advised to reduce air contamination, and to insist on both personal and plant cleanliness. Specific recommendations for reducing the level of worker exposure to the toxic substance included the covering of conveyor belts, installing spouts through which liquid or powder went into cans or bags with suction around them to prevent spillage, channeling the chemical liquid overflow to pipes, not open gutters, and using the least toxic solvents for cleaning. As testimony from plant employees at trial graphically demonstrated, however, these suggestions were either ignored or poorly implemented.
Although Diamond's former plant managers maintained that dioxin was not identified as the toxic substance causing the chloracne until 1965, this possibility was clearly foreshadowed by information imparted from outside sources. For example, *183 plant manager John Burton was informed on September 30, 1959, that a German chemical manufacturer had discovered dioxin was the causative agent. At the same time, Burton was told that decreasing the reaction temperature would reduce the production of dioxin in the TCP. This information was ignored, however, because reduction of the temperature in the autoclave where TCP was produced would diminish the conversion rate, thereby decreasing production efficiency. In sum, the record reveals that at a relatively early date, Diamond became aware of the dangerous propensities of dioxins and chose to disregard methods designed to diminish their production.
A number of former plant employees testified concerning Diamond's waste disposal policy which essentially amounted to "dumping everything" into the Passaic River. We digress to note that neither Federal nor State environmental protection agencies have directed Diamond to remediate the damage to the river. As Diamond correctly points out in its brief, the claims which are the subject of this litigation do not encompass losses resulting from the discharge of substances into the Passaic River. We nevertheless recount this evidence because it bears upon the state of Diamond's knowledge and intent regarding the environmental damage caused by its operations. At least to some extent, this evidence disclosed a less than benign indifference to the consequences of Diamond's operations that directly bears upon whether other discharges and their effects were accidental or inadvertent. See Evid.R. 46.
To summarize this testimony briefly, it was clear that prior to 1956, all waste products from chemical processes were either directly discharged or ultimately released into the Passaic River. However, in 1956 an industrial sewer line was installed connecting the plant to the Passaic Valley Sewerage Commission Lister Avenue Line. Nevertheless, the testimony is persuasive that not all of the effluent from the plant was directed to that sewer line. DDT was manufactured until about 1959. So much DDT waste water was directed into the river that a mid-river "mountain" of DDT was created. Employees were *184 directed to surreptitiously wade into the river at low tide and "chop up" the deposits so that they would not be seen by passing boats.
In 1960, a reaction in a TCP autoclave whose temperature was "out of control" caused an explosion which destroyed the larger of the two process buildings on Diamond's Newark property. The building was reconstructed in 1961 but thereafter production was limited to phenoxy herbicides. The old but undamaged chemical manufacturing building was the site of 2,4-D and 2,4,5-T production along with their esters and amines. Former Diamond employees provided graphic descriptions of the company's heedless indifference to the environmental damage which resulted from its manufacturing operations.
According to one of Diamond's employees, Chester Myko, the floor in the old building was the "dirtiest place in the entire plant." The 2,4,5-T and 2,4-D (Agent Orange ingredients) were "always on the floor." These substances solidified into a slippery, oily film which prevented normal walking. The witness related that "every other week or so" the floor was washed down with sulfuric acid with the waste water flowing into trenches which led outside the building into the river. Walter Blair testified that even after the damaged plant was rebuilt, waste in the form of hydrochloric acid was still being discharged into the river. Although a trench and waste water pit were constructed, they often became blocked, causing the effluent to "back up" and migrate into the river. Blair, too, corroborated Myko's testimony concerning the 2,4-D and 2,4,5-T found on the floor. These substances were washed off the floor and the waste water was allowed to flow outside the building and eventually into the river.
Arthur Scureman, another employee who worked in the plant under both Kolker and Diamond management until 1969, verified the "sloppy practices" tolerated by Diamond's officers. He confirmed that there were numerous leaks in the autoclave room where the TCP was made. There were leaks in the pipes *185 that ran between the two buildings, and hazardous substances escaped, eventually meandering toward the river. Pipes with caustic material also ran between the two buildings. Often the material would freeze. In order to free the substances, employees would break and then steam clean the pipes. The material steamed from the pipes would either be released onto the ground or discharged into the river. Pipelines along the 2,4,5-T unit constantly became clogged with phenol which would seep into the ground because the trenches designed to carry the substance away from the building had been destroyed by acid. Scureman was also responsible for packaging drums of Agent Orange that were ultimately shipped to Vietnam. He claimed that in the packaging process the material constantly spilled onto the ground.
Aldo Andreini, employed by Diamond between 1959 and 1969, explained that he was a formulator who was required to clean the 10,000 gallon storage tanks located on the plant site. The storage tanks contained amine, butyl-T 2,4,5-T and 2,4-D. The witness recounted that he would clean the tanks by shoveling out the sediment once or twice each month. The procedure was to shovel the sediment to someone outside who was holding a drum and then the filled drums were to be carted away. In the process, both liquid and solid materials fell off the drum onto the ground where they would be washed off. Andreini was also charged with loading railroad cars with Diamond's product. When the insides of these rail cars were washed down with water, the effluent would seep onto the tracks and into the ground.
In addition to the spills and run-off which marked the 2,4,5-T and TCP processes, the vapors which were produced by the chemical reactions were vented into the atmosphere on a daily basis. In 1963, some of this venting was alleviated when the 2,4-D acid process was rehabilitated. The roof of that process building was raised to permit installation of new ventilating ducts which carried the process fumes to a caustic scrubber. In 1967, Diamond constructed a carbon tower through which all *186 TCP made at the plant was processed. The carbon tower was designed to remove the dioxin to at or below one part per million. Nevertheless, despite installation of the carbon absorption tower there was still no decrease in chloracne among Diamond's workers.
The last TCP production occurred in June 1969. The plant was closed in August 1969 and remained idle until it was purchased by Chemicaland Corporation in March 1971. Chemicaland made benzyl alcohol which it sold through its affiliate, Cloray NJ Corporation. No subsequent purchaser manufactured TCP or any dioxin-containing product on the site.
In 1982 the United States Environmental Protection Agency (EPA) initiated a National Dioxin Strategy targeting facilities that produced 2,4,5-T and its pesticide derivatives for soil sampling and testing for dioxin. A list of contaminated sites was issued with the Lister Avenue property prominently designated. After the DEP was informed that dioxin had been found in the soil of Diamond's Lister Avenue plant, Governor Kean issued an executive order authorizing that agency to engage in emergency measures "necessary to fully and adequately protect the health, safety and welfare of New Jersey citizens." Pursuant to that direction, the DEP issued an administrative order on June 13, 1983, requiring Diamond to implement certain partial site stabilization measures designed to prevent further off-site migration of dioxin.
Two administrative consent orders were entered into between Diamond and the DEP. In March 1984, the first administrative consent order required Diamond to (1) perform a site evaluation to determine the extent and scope of the contamination on its property, (2) prepare a feasibility study to consider various alternatives for remediation, (3) post a letter of credit in the amount of $12,000,000 to guarantee its performance of its responsibilities under the order, and (4) establish a standby trust so that the DEP could draw on those funds to retain its own contractors in the event Diamond failed to perform the *187 necessary measures. On December 20, 1984, a second administrative consent order was entered into between the DEP and Diamond, supplementing the first. This consent order pertained to off-site remediation. It required Diamond to (1) prepare a study on the remediation of the contamination of surrounding sites, (2) identify the scope and extent of the contamination, and (3) develop a feasibility study concerning the appropriate ultimate remediation of the pollution. The DEP directed Diamond to secure a $4,000,000 letter of credit to insure performance of its obligations.
Deputy Commissioner Michael Catania explained that the studies concerning the scope and extent of contamination required testing to determine if "action levels" of dioxin were present on the surrounding properties and, of course, on the Lister Avenue site itself. An "action level" is the standard utilized by the DEP to determine when remedial action is necessary. In layperson's terms, it is a threshold level of contamination above which some remediation is mandatory. The DEP's action level for dioxin used at the Lister Avenue site was one part per billion  a standard established by the Center for Disease Control in Atlanta. Testing of the surrounding areas adjacent to Lister Avenue revealed action level amounts of dioxin in an eight- to ten- square-block area. Included in that area were residential properties as well as other industrial and commercial sites. Catania concluded that the dioxin had migrated from the site by natural modes (river flooding and surface water runoff) as well as by human means of transportation (the explosion of the herbicide process building, a local iron and metal works purchase of scrap metal from Diamond which had been stored on Diamond's property with high levels of dioxin contamination, and the workers' own shoes and car tires which moved from the contaminated site onto neighboring properties).
Anthony Wolfskill, Diamond's expert on the occurrence and migration of dioxin on the site and neighboring properties essentially agreed with Catania's opinion concerning the causes *188 of the contamination. He concluded that the highest concentration of dioxin contamination in the soil at the Lister Avenue plant correlated with the locations where the TCP or 2,4,5-T products had been manufactured, stored or shipped. In his opinion, the contamination of the plant site occurred as a result of numerous small leaks and spills. The likely cause of dioxin contamination of the soil was from plant operations where the dioxin fell to the floor and, through cracks and fissures, entered the soil. From his testing, he determined that the highest reading of dioxin occurred next to the sewer line. This finding was suggestive of the thesis that the primary entry of dioxin into the soil was closely associated with either the sewer, the sump pumps, or the floor slabs that were in the process building. In the area of the processing plant where there was no concrete slab, there was dioxin leakage directly into the ground. Despite these findings, Wolfskill maintained that the Lister Avenue plant was operated in accordance with standard or typical industrial practices with respect to discharges onto the soil, groundwater, surface water and the air.
In January 1985, the EPA and Diamond signed a voluntary cost reimbursement agreement pursuant to which Diamond paid the EPA approximately $2,000,000 representing expenses incurred with respect to the site. As we noted earlier, the amount of Diamond's ultimate liability for environmental pollution has not yet been determined.
During Diamond's ownership of the Lister Avenue plant (1951 to 1971) and beyond, at least through 1984, it was covered by a series of primary and excess insurance policies, which grew in number and coverage amount as the years passed. Throughout this period, Aetna was the primary insurer. With the exception of a brief period (between 1971 and 1975), London Market insurers provided excess coverage. As we will note later in our opinion, Diamond also had foreign liability insurance which was applicable to injuries which took place outside of the United States. We mention at this point that all claims filed against the foreign liability insurers were dismissed on the *189 ground that Diamond was guilty of late notice under New York law. Although no appeal has been taken from that decision, the foreign risk policies are nonetheless relevant because they provided a layer of coverage which impacts upon the excess carriers' liability. We observe at this point that, as the years passed, the "layers" of excess insurance grew as did the number of excess providers who insured the risk.
Diamond purchased its insurance through the brokerage firm of Alexander & Alexander, one of the largest insurance brokers in the world. Alexander & Alexander had its primary office in New York City. Diamond created an internal insurance department in 1953 and installed Albert Ingley as its first manager. He remained in that position until 1957 when he was succeeded by Donald Purdy, who was in turn succeeded by Robert Stauffer in 1982. Only Ingley and Stauffer testified at trial. Conrad Giles, an Alexander employee, was responsible for Diamond's account from the mid-1950's until 1973. Giles was succeeded by William Green who remained on Diamond's account until Diamond "switched" brokerage firms in 1982. While the witnesses and counsel spoke in terms of "negotiating" the language of the policies, Giles and Stauffer explained that this was a misnomer. Existing policies were used to "negotiate terms" but there were "no real negotiations." Giles explained that certain clauses were standard in the policies and would not be changed by the insurers. Exclusions, for example, were not subject to negotiation. While enlargements of coverage could be negotiated as could amounts of liability, the carriers refused to discuss exclusions. Furthermore, there was no drafting of policy language. Policies were a "cut and paste operation," using provisions from existing standard policies. Policies which were "cut and pasted together" were denominated "manuscript policies," as opposed to printed form policies. Nevertheless, the transcript plainly established that true "negotiations" were severely limited.
There was even less negotiation when it came to obtaining excess insurance from the London Market. The London Market *190 is a collection of insurers that operates out of London, England. Business from North America is placed on the London Market only through a specific brokerage network, of which Alexander & Alexander was not a part. Lloyds of London is a separate group of insurers who deals with its own approved brokers and obtains business from the United States through them. Lloyds is a collection of syndicates and only a Lloyds' broker is permitted to transact business. Insurance was placed with Lloyds, and presumably the London Market as well, through a "leader," an individual who would indicate policy and premium terms, and conditions on the risk. Once the Lloyds' broker selected a "leader," the broker would give the leader a slip "which contained details about the risk, period of the policy, limits of liability, and other conditions the insured might want in the policy." The leader amended the slip to reflect unacceptable terms and conditions, and if the potential insured agreed, the policy was issued. To the extent there were negotiations in this process, they took place between the Lloyds' broker and the underwriter.
Based upon these facts, the Chancery Division determined that the environmental damage claims were not covered. In reaching this conclusion, the court distinguished between the insuring agreements contained in Aetna's policies over the course of the thirty year period. The policies issued between 1951 and 1960 were "accident-based." Coverage was triggered by an "accident," which the court defined as a "discrete fortuitous event which happens within a short time at a specific time and place." The court emphasized that the contamination of Diamond's plant and the surrounding area was the result of "a continuous process of discharging and spilling chemicals ... which gradually produced action levels of a number of priority pollutants." Because "[t]his gradual degradation of the environment (along with possible injury to persons) [was] not attributable to any definite event," the court found that the loss was "not `caused by accident.'"
*191 The policies in effect between 1960 and 1970 were "occurrence-based." An "occurrence" was defined in the policies as an "accident" or "continuous or repeated exposure to conditions" which results in injury "neither expected nor intended from the standpoint of the insured." In that context, the court found that Diamond's "pollution conduct was fully intentional" and did not constitute an "occurrence" within the meaning of the policy language. The policies issued between 1971 and 1985 were "occurrence-based," but also contained pollution exclusions. Excepted from the exclusions were discharges which were "sudden and accidental." As an additional predicate to its conclusion that Diamond's losses were not the result of an occurrence, the court further found that the pollution exclusion was applicable. In construing the exclusion, the Chancery Division determined that Diamond was a "sophisticated and knowledgeable insured" and fully understood that gradual contamination was excepted from coverage.

B.
We now describe the facts relating to the Agent Orange claim. "Agent Orange" is a code name developed and used by the United States government to identify a certain kind of phenoxy herbicide. It was used as part of military operations in Vietnam. It was employed to defoliate Vietnamese jungle trails to deny enemy forces the benefit of concealment along transportation and power lines and near friendly base areas. It was also used to destroy enemy camps and food supplies. See In re Agent Orange Product Liability Litigation, 818 F.2d 187, 193 (2d Cir.1987), cert. denied, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).
Defoliant operations began on a limited scale in Vietnam in late 1961. In re Agent Orange Product Liability Litigation, 597 F. Supp. 740, 775 (E.D.N.Y. 1984), aff'd, 818 F.2d 145 (2d Cir.1987), cert. denied, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988). The Air Force expanded the defoliation program in *192 January 1962 under the code name "Project Ranch Hand." In the beginning, aerial spraying took place near Saigon in order to clear the thick jungle canopy from around the roads, power lines and other lines of communications to lessen the potential of ambush. There was also some ground, hand spraying around gun emplacements to reduce surprise attacks and to maintain open lines of fire. In late 1962, approval was given for the offensive use of herbicides to "destroy planted fields and crops suspected of being used by the Viet Cong." Ibid.
Agent Orange was but one of six different types of phenoxy herbicides used in the defoliation process. Id. at 775-76. After 1964, however, Agent Orange was one of the most widely used of the herbicides because it proved to be an effective defoliant when applied in heavy concentrations on a wide variety of woody and broad leaf herbaceous plants. Id. at 776. The herbicides were applied in Vietnam at the rate of three gallons of herbicide per acre. This can be compared to the domestic use of 2,4-D and 2,4,5-T herbicides which were applied at a rate of only one gallon per acre. Ibid. Even higher concentrations were sometimes dropped on small areas when aircraft malfunctioned or when it was necessary to move quickly to escape enemy fire. Ibid.
Herbicide spraying in South Vietnam reached its peak in 1967. Approximately 1.7 million acres were sprayed, largely for defoliation purposes. Ibid. Increasing controversy arose over the use of herbicides in Vietnam following a report which indicated that 2,4,5-T caused malformed offspring and stillbirth in mice when administered in high doses to the mothers. Ibid. By April 1970, domestic use of herbicides containing 2,4,5-T was suspended. At the same time the Department of Defense suspended military use of 2,4,5-T, including Agent Orange, pending further evaluation. Ibid. In January 1971 the last Ranch Hand mission took place. Id. at 777.
In total, between 17 and 19 million gallons of herbicides, including Agent Orange, were sprayed in Vietnam between *193 January 1965 and February 1971. Between eight and ten percent of South Vietnam's total land area was sprayed. Ibid.
The precursor to this litigation was a lawsuit filed in July 1978 by a Vietnam veteran in the Supreme Court of New York County. Named as defendants were seven chemical companies, including Diamond. The case was removed to the United States District Court for the Eastern District of New York. Ultimately, the case was consolidated with hundreds of similar suits and certified as a class action. In re Agent Orange Product Liability Litigation, 818 F.2d at 152-53. The District Court judge defined the class as consisting of "those persons who were in the United States, New Zealand or Australia Armed Forces between 1961 to 1972 who were injured while in or near Vietnam by exposure to Agent Orange or other phenoxy herbicides.... The class also includes spouses, parents and children of the veterans born before January 1, 1984, directly or derivatively injured as a result of the exposure." Id. at 154 (quoting In re "Agent Orange" Product Liability Litigation, 100 F.R.D. 718, 729 (E.D.N.Y. 1983)). Trial of the class action was scheduled for May 7, 1984. In April, however, the District Court appointed three special masters to assist in negotiations concerning settlement of the class action. On the day trial was to have commenced, the class representatives and the chemical companies, including Diamond, agreed to settle the claims for $180,000,000. Id. at 155. The judge subsequently conducted extensive hearings on the fairness of the proposed settlement in New York, Atlanta, Houston, Chicago and San Francisco. Ibid. He approved the settlement subject to hearings on counsel fees and preliminary consideration of plans for distribution of the settlement proceeds. In re Agent Orange Product Liability Litigation, 597 F. Supp. at 862. The Court of Appeals subsequently affirmed that approval. In re Agent Orange Product Liability Litigation, 818 F.2d at 145.
Diamond's share of that $180 million settlement was $21,546,972.85 in principal and $1,792,444.51 in interest. A check in the amount of $23,339,417.36 was forwarded to the Clerk of the *194 United States District Court for the Eastern District of New York to be deposited in the Agent Orange settlement fund on January 14, 1985.
There is no question Aetna was aware that Diamond intended to participate in the settlement of this class action. On May 4, 1984, Aetna sent a letter to Diamond indicating its awareness that settlement negotiations were being conducted. Aetna noted that, while it reserved its rights on coverage, it would not contest the amount of the settlement. However, Aetna maintained that it was not possible to determine if it was responsible for the settlement amount, because it lacked information as to who was injured, what the injuries were or when they occurred. Aetna considered this information vital in order to determine the number of "occurrences" and the corresponding limits of liability under the respective policies.
Nevertheless, Aetna decided to "take a pragmatic approach" to the problem. Although it would have been easier to deny coverage because so many coverage-determination elements were missing, Aetna considered this course irresponsible in light of the political and social ramifications that would follow. Consequently, Aetna offered Diamond $10,800,000. It arrived at the amount by aggregating the policy limits for all of the covered years between 1966 and 1969. Those dates were chosen because Aetna had determined that the major use of Agent Orange occurred in this period. So too, the highest troop concentration in Vietnam occurred in 1966 and continued on through the early 1970's, until there was a withdrawal of all troops. Using those dates Aetna concluded that "the fairest thing to do" would be to trigger those policies, on a compromised basis, starting with the 1966 policy through 1973 when the final withdrawal occurred. Aggregating the policy limits during that period resulted in a $10,800,000 figure which was "net of the deductibles." Diamond continued to demand full indemnification for its entire settlement contribution.
*195 The question of notice to the excess insurers and foreign risk carriers concerning the settlement is less clear. Suffice it to say, Diamond advised certain of its excess insurers that seven Agent Orange defendants were about to settle the class action for a total sum of $180,000,000. However, Diamond's risk manager conceded that he did not apprise the carriers of the amount of its contribution to the settlement.
The Chancery Division determined that the Vietnam veterans' class action constituted a products liability claim which was covered under the primary and excess policies. Applying New York law, the court found that all of the carriers had adequate notice of the class action and the opportunity to defend. In addition, the court decided that the war risk exclusion was not applicable because the injuries sustained by military personnel did not arise from actual hostile actions. The remaining problems involved allocating coverage to particular policies.
All of the potentially implicated policies provided coverage on an "occurrence" basis. Difficult questions were raised concerning the manner of defining what event or complex of events constituted the "occurrence." Ancillary issues pertained to the timing of the "occurrence," the number of "occurrences," and the place in which they happened. The court rejected the thesis that there was an "occurrence," with a corresponding deductible, each time a soldier was exposed to Agent Orange. In a similar vein, the judge found no merit in the carriers' claim that there was an "occurrence" for each "batch" of Agent Orange shipped to Vietnam. The court observed that under either theory the stacking or aggregating of deductibles would result in no recovery or a negligible one. The court stressed that, apart from the evident unfairness in reading the policy language to maximize the number of occurrences and corresponding deductibles, the carriers' argument did not comport with the reality of the situation. According to the court, the overriding and pivotal fact was that Diamond's liability was the result of its defective design of the herbicide. Unlike a manufacturing defect, where the product is unsafe because it deviates from a *196 standard plan, Agent Orange was found to be unsuitable because, as designed, it was unreasonably dangerous. Applying this analytical framework, the court found that the "occurrence," the event that triggered liability, took place when the product was delivered to the military. The judge thus held that the delivery of Agent Orange in the United States constituted the "occurrence." Moreover, the court found that the entire series of deliveries constituted a single, continuous occurrence. Although the injuries to individual servicemen in Vietnam resulted in the loss, the triggering event upon which coverage was predicated was said to have occurred in the United States.
As we will note later in our opinion, the Chancery Division's findings and conclusions mirrored those adopted by the United States District Court in Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. 1368 (E.D.N.Y. 1988). There, the District Court judge held that the delivery of Agent Orange to the military constituted an "occurrence" under a similarly worded policy. The judge also determined that the series of deliveries constituted a single occurrence, thereby obviating the necessity of aggregating deductibles. Id. at 1383.
The Chancery Division also adopted the allocation formula applied by the District Court in Uniroyal. Under this formula, the settlement amount was divided by the total number of gallons of Agent Orange delivered by Diamond to the military. The dates of exposure were estimated by applying the hypothesis that spraying took place four months after the date of the shipment. This analytical construct was based upon military records which disclosed the average interval between shipments of Agent Orange and spraying with the consequent exposure. The thesis was that each gallon shipped resulted in an injury exactly four months after the date of delivery. By applying this formula, a date and dollar value could be fixed for every loss. When coverage under the primary policy in force on a given date was exhausted, the loss would travel up the layers of excess policies. One deductible would be applied against the losses on each of Aetna's primary policies which were triggered. *197 The insurers were held to be responsible for interest on the settlement amount in proportion to their responsibility for the principal.
It is against this factual backdrop that we consider the arguments advanced. We first review the issues dealing with environmental contamination. We then address the Agent Orange claims.

II.
Diamond asserts that the Chancery Division misconstrued the various insuring agreements contained in the policies issued by Aetna over the thirty year period in which soil and water contamination occurred. Despite the number and complexity of the issues presented, the conclusion we reach is disarmingly simple. We are convinced from our examination of the record that Diamond intentionally and knowingly discharged hazardous pollutants with full awareness of their inevitable migration to and devastating impact upon the environment. However phrased or defined, the insuring agreements did not cover losses resulting from Diamond's deliberate and willful course of misconduct.

A.
Preliminarily, we take the issues out of order and consider Aetna's claim, asserted in its cross-appeal, that New York law should apply. Aetna asserts that New York law is applicable because that state was the "place of the contract." It is argued that New Jersey may have the overriding interest in seeing that the damage to the environment is cured, but not in determining who will pay for it.
We disagree. It is difficult to imagine any interest that New Jersey could have that would be more compelling, or more dominant and significant, than its concern in determining the availability of funds for the cleanup of hazardous substances within its borders. See Leksi, Inc. v. Federal Ins. Co., 736 *198 F. Supp. 1331, 1335 (D.N.J. 1990). Since New Jersey has a paramount interest in the remediation of such waste sites, and in the fair compensation of its victims, this State's urgent concern for the health and safety of its citizens "extends to assuring that casualty insurance companies fairly recognize the legal liabilities of their insureds." Johnson Matthey Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 250 N.J. Super. 51, 57, 593 A.2d 367 (App.Div. 1991).
We recognize that the law of the place of an insurance contract ordinarily governs the choice of law because it will generally comport with the reasonable expectations of the parties concerning the principal location of the insured risk and will furnish needed certainty and consistency. State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 84 N.J. 28, 37, 417 A.2d 488 (1980). However, that basic rule yields to the dominant and significant relationship of another state with the parties, the transaction and underlying issue. Ibid. The object is to determine which of the jurisdictions has the most significant governmental interests in the dispute. Here, we are convinced that the state with the site of the peril and ultimate damage has the dominant interest in the controversy. See Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 254 N.J. Super. 43, 46, 603 A.2d 61 (App.Div. 1992); Johnson Matthey Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 250 N.J. Super. at 54-55, 593 A.2d 367; cf. Bell v. Merchants and Businessmen's Mut. Ins. Co., 241 N.J. Super. 557, 564, 575 A.2d 878 (App.Div.), certif. denied, 122 N.J. 395, 585 A.2d 395 (1990).
We acknowledge that this issue has received uneven treatment. See Westinghouse Elec. Corp. v. Liberty Mut. Ins. Co., 233 N.J. Super. 463, 476, 559 A.2d 435 (App.Div. 1989). It is true that under the view we express here a single insurance policy providing integrated comprehensive coverage for nationwide risks could mean something different in every state. Ibid. However, nationwide uniformity, though desirable, is an illusory *199 goal in the context of this issue. Site-specific uniformity is more achievable, and represents a choice of law of the jurisdiction most concerned with the outcome. We hold that New Jersey courts should interpret according to this state's substantive law an insurance clause contained in a comprehensive general liability insurance policy, wherever written, which was purchased to cover an operation or activity which generates toxic wastes that "predictably come to rest in New Jersey, and impose legal liabilities there on the insured." Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 254 N.J. Super. at 51, 603 A.2d 61.

B.
We begin by taking the unusual course of delineating the issues we do not reach. Initially, we have no occasion to decide whether the Chancery Division judge was correct in defining the word "accident" to mean "a discrete fortuitous event which happens within a short time at a specific time and place." As we noted earlier, the policies issued between 1951 and 1960 provided coverage for injury and damage caused by an "accident." However, none of the policies defined that term. Citing early reported workers' compensation opinions, the Chancery Division adopted a time-specific definition. See Dudley v. Victor Lynn Lines, Inc., 32 N.J. 479, 491, 161 A.2d 479 (1960); Smith v. International High Speed Steel Co., 98 N.J.L. 574, 575, 120 A. 188 (E. & A. 1923); United States Radium Corp. v. Globe Indem. Co., 13 N.J. Misc. 316, 324, 178 A. 271 (Sup.Ct. 1935), aff'd, 116 N.J.L. 90, 182 A. 626 (E. & A. 1936); Liondale Bleach, Dye and Paint Works v. Riker, 85 N.J.L. 426, 429, 89 A. 929 (Sup.Ct. 1914). We note that the temporal aspect of this definition in the context of workers' compensation has been questioned in several decisions of our Supreme Court. See, e.g., Spindler v. Universal Chain Corp., 11 N.J. 34, 38, 93 A.2d 171 (1952); Neylon v. Ford Motor Co., 8 N.J. 586, 588, 86 A.2d 577, rev'd on other grounds, 10 N.J. 325, 91 A.2d 569 (1952). We also point to a long line of insurance cases which has *200 construed the term consonant with "its usual and popular sense" as signifying a "happening by chance" which is "unforeseen" or "unexpected." Riker v. John Hancock Mut. Life Ins. Co., 129 N.J.L. 508, 510-11, 30 A.2d 42 (Sup.Ct. 1943); see also Linden Motor Freight Co., Inc. v. Travelers Ins. Co., 40 N.J. 511, 526, 193 A.2d 217 (1963); White v. Metropolitan Life Ins. Co., 118 N.J.L. 149, 151, 191 A. 770 (E. & A. 1937); Walters v. Prudential Ins. Co., 116 N.J.L. 304, 307, 183 A. 897 (E. & A. 1936); SL Industries v. American Motorists, 248 N.J. Super. 458, 465, 591 A.2d 677 (App.Div.), certif. granted, 126 N.J. 387, 599 A.2d 163 (1991); John's Cocktail Lounge, Inc. v. North River Ins. Co., 235 N.J. Super. 536, 541-42, 563 A.2d 473 (App.Div. 1989); Furr v. Metropolitan Life Ins., 111 N.J. Super. 596, 600, 270 A.2d 69 (Law Div. 1970); Kobylakiewicz v. Prudential Ins. Co. of America, 115 N.J.L. 382, 384, 180 A. 491 (Sup.Ct. 1935). The latter cases comport with decisions in other jurisdictions. See, e.g., United States Mut. Accident Ass'n v. Barry, 131 U.S. 100, 121, 9 S.Ct. 755, 762, 33 L.Ed. 60, 67 (1889); Beryllium Corp. v. American Mut. Liab. Ins. Co., 223 F.2d 71, 73-74 (3d Cir.1955); Moffat v. Metropolitan Cas. Ins. Co. of New York, 238 F. Supp. 165, 169-70 (M.D.Pa. 1964); City of Myrtle Point v. Pacific Indem. Co., 233 F. Supp. 193, 197 (D.Or. 1963); Employers Ins. Co. of Ala. v. Rives, 264 Ala. 310, 324, 87 So.2d 653, 656-57 (1955), certif. denied, 264 Ala. 696, 87 So.2d 658 (1956); Canadian Radium & Uranium Corp. v. Indemnity Ins. Co., 411 Ill. 325, 332, 104 N.E.2d 250, 255 (1952); The Travelers v. Humming Bird Coal Co., 371 S.W.2d 35, 38 (Ky. Ct. App. 1963); McGroarty v. Great Am. Ins. Co., 43 A.D.2d 368, 373-74, 351 N.Y.S.2d 428, 433 (1974), aff'd, 36 N.Y.2d 358, 368 N.Y.S.2d 485, 329 N.E.2d 172 (1975); Wolk v. Royal Indem. Co., 27 Misc.2d 478, 482-83, 210 N.Y.S.2d 677, 682 (Sup.Ct. 1961); Taylor v. Imperial Cas. & Indem. Co., 82 S.D. 298, 144 N.W.2d 856, 859 (1966). In any event, we leave resolution of the issue to another day.
We also need not determine whether the environmental losses fell within the pollution exclusion, as found by the Chancery *201 Division judge. The pollution exclusion was contained in all of the policies issued by Aetna between 1971 and 1985. The exclusion reads as follows:
This insurance does not apply:
To bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials or other irritants, contaminants, or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, disposal, release or escape is sudden and accidental. (emphasis added).
Aetna contended below, and continues to argue here, that the release and migration of dioxins from Diamond's plant was not "sudden and accidental" and the resulting loss came within the pollution exclusion. The principal thrust of its contention is that the word "sudden" has a temporal meaning and the exclusionary clause thereby bars recovery for losses caused by pollution except where the damage is the result of an unexpected and instantaneous catastrophe.
We considered and rejected the identical argument in Broadwell Realty Services, Inc. v. Fidelity & Cas. Co. of New York, 218 N.J. Super. 516, 528 A.2d 76 (App.Div. 1987). Relying on a series of prior reported opinions, see Lansco, Inc. v. Department of Environmental Protection, 138 N.J. Super. 275, 282, 350 A.2d 520 (Ch.Div. 1975), aff'd, 145 N.J. Super. 433, 368 A.2d 363 (App.Div. 1976), certif. denied, 73 N.J. 57, 372 A.2d 322 (1977); CPS Chem. Co., Inc. v. Continental Ins. Co., 199 N.J. Super. 558, 569, 489 A.2d 1265 (Law Div. 1984), rev'd on other grounds, 203 N.J. Super. 15, 495 A.2d 886 (App.Div. 1985); Jackson Tp. Mun. Utils. Auth. v. Hartford Acc. & Indem. Co., 186 N.J. Super. 156, 161, 451 A.2d 990 (Law Div. 1982), the history of the "occurrence" policy definition and pollution exclusion to the industry-wide revisions of standard general liability provisions in 1966 and again in 1973, see 3 Long, The Law of Liability Insurance, 53 (1966); Hourihan, Insurance Coverage for Environmental Damage Claims, 15 Forum 551, 552 (1989); DRI Monograph, The New Comprehensive General Liability  A Coverage Analysis, 6 (Nov. 1966); E. Joshua Rosenkranz, *202 Note, The Pollution Exclusion Clause Through the Looking Glass, 74 Geo.L.J. 1237, 1245 (1986), and well-settled principles of contract interpretation, see Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 611, 503 A.2d 862 (1986); DiOrio v. New Jersey Mfrs. Ins. Co., 79 N.J. 257, 269, 398 A.2d 1274 (1979); Allen v. Metropolitan Life Ins. Co., 44 N.J. 294, 305, 208 A.2d 638 (1965); Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, Switzerland, 35 N.J. 1, 7, 170 A.2d 800 (1961); Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961), we construed the word "sudden" in terms of an "unexpected," "unforeseen" or "fortuitous" event. Broadwell Realty Services, Inc. v. Fidelity & Cas. Co. of New York, 218 N.J. Super. at 530-31, 528 A.2d 76. In reaching this conclusion, we emphasized that the question presented was purely one of contractual interpretation. Id. at 522, 528 A.2d 76. We nevertheless added that important public policy considerations militated in favor of the conclusion we reached. For example, by defining the word "sudden" as meaning unexpected and unintended, we avoided the question "whether the focus of the exclusion is upon the release of the contaminant or the resulting permeation and damage to the environment." Id. at 535, 528 A.2d 76. We observed that this issue had generated substantial debate in those jurisdictions which have construed the word "sudden" in temporal terms. See E. Joshua Rosenkranz, Note, The Pollution Exclusion Clause Through the Looking Glass, 74 Geo. L.J. at 1296. We also noted that our interpretation of the exclusion furthered the policy of deterrence by punishing the intentional polluter and by rewarding the innocent. Broadwell Realty Services, Inc. v. Fidelity & Cas. Co. of New York, 218 N.J. Super. at 534, 528 A.2d 76.
Our holding in Broadwell has been followed in New Jersey in a variety of factual settings. See Johnson Matthey Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 250 N.J. Super. at 54, 593 A.2d 367; State, Dep't of Environmental Protection v. Signo Trading Intern. Co., Inc., 235 N.J. Super. 321, 332 n. 1, 562 A.2d 251 (App.Div.) certif. granted, 118 N.J. 227, 570 A.2d 980 *203 (1989); Summit Assoc. v. Liberty Mut. Fire Ins. Co., 229 N.J. Super. 56, 62, 550 A.2d 1235 (App.Div. 1988). Perhaps, as a result, the insurance industry has structured an "absolute exclusion" while still making available separate coverage for pollution related claims. See Vantage Dev. Corp., Inc. v. American Env. Tech. Corp., 251 N.J. Super. 516, 525, 598 A.2d 948 (Law Div. 1991). However, the Chancery Division judge expressed his view that Broadwell was wrongly decided and urged us to reconsider the question.
We recognize that the issue resolved in Broadwell is reasonably debatable. In the course of our opinion, we alluded to the "degree of disarray in the decisional treatment" of this question throughout the nation. Id. at 531, 598 A.2d 948. Compare National Grange Mut. Ins. Co. v. Continental Cas. Ins. Co., 650 F. Supp. 1404, 1411-12 (S.D.N.Y. 1986); State of Idaho v. Bunker Hill Co., 647 F. Supp. 1064, 1072-73 (D.Idaho 1986); Payne v. United States Fidelity and Guar. Co., 625 F. Supp. 1189, 1192-93 (S.D.Fla. 1985); United States Fidelity and Guar. Co. v. Armstrong, 479 So.2d 1164, 1168 (Ala. 1985); Molton, Allen and Williams v. St. Paul Fire & Marine Ins. Co., 347 So.2d 95, 98-99 (Ala. 1977); Reliance Ins. Co. of Illinois v. Martin, 126 Ill. App.3d 94, 97-98, 81 Ill.Dec. 587, 590-91, 467 N.E.2d 287, 289-90 (App.Ct. 1984); Travelers Indem. Co. v. Dingwell, 414 A.2d 220, 224-25 (Me. 1980); Shapiro v. Public Service Mut. Ins. Co., 19 Mass. App. 648, 651-53, 477 N.E.2d 146, 150 (App.Ct.), review denied, 395 Mass. 1102, 480 N.E.2d 24 (1985); Jonesville Products, Inc. v. Transamerica Ins. Group, 156 Mich. App. 508, 509, 402 N.W.2d 46, 47 (Ct.App. 1986); General Ins. Co. of Am. v. Town Pump, Inc., 214 Mont. 27, 31, 692 P.2d 427, 429-30 (1984); Niagara Cty. v. Utica Mut. Ins. Co., 103 Misc.2d 814, 818, 427 N.Y.S.2d 171, 174 (Sup.Ct. 1980), aff'd, 80 A.D.2d 415, 439 N.Y.S.2d 538 (App.Div.), appeal dismissed, 54 N.Y.2d 608, 443 N.Y.S.2d 1030, 427 N.E.2d 1191 (1981); Farm Family Mut. Ins. Co. v. Bagley, 64 A.D.2d 1014, 409 N.Y.S.2d 294, 295-96 (App.Div. 1978); Allstate Ins. Co. v. Klock Oil Co., 73 A.D.2d 486, 488, 426 N.Y.S.2d 603, 604-05 *204 (App.Div. 1980); Buckeye Union Ins. Co. v. Liberty Solvents and Chem. Co., Inc., 17 Ohio App.3d 127, 128-29, 17 O.B.R. 225, 226-28, 477 N.E.2d 1227, 1230 (Ct.App. 1984); United Pacific Ins. Co. v. Van's Westlake Union, Inc., 34 Wash. App. 708, 714, 664 P.2d 1262, 1266 (Ct.App.), review denied, 100 Wash.2d 1018 (1983), with Great Lakes Container Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania, 727 F.2d 30, 33-34 (1st Cir.1984); American Mut. Liab. Ins. Co. v. Neville Chem. Co., 650 F. Supp. 929, 932-33 (W.D.Pa. 1987); Grant-Southern Iron & Metal Co. v. CNA Ins. Co., 669 F. Supp. 798, 800 (E.D.Mich. 1986), dismissed, 838 F.2d 470 (6th Cir.1988); Fischer & Porter Co. v. Liberty Mut. Ins. Co., 656 F. Supp. 132, 140 (E.D.Pa. 1986); American States Ins. Co. v. Maryland Cas. Co., 587 F. Supp. 1549, 1553 (E.D.Mich. 1984); Barmet of Indiana, Inc. v. Security Ins. Group, 425 N.E.2d 201, 202-03 (Ind. Ct. App. 1981); Waste Management of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 696-97, 340 S.E.2d 374, 380-81 (1986), rev'd on other grounds, 734 F.2d 159 (4th Cir.1984); Transamerica Ins. Co. v. Sunnes, 77 Or. App. 136, 139, 711 P.2d 212, 214 (Ct.App. 1985), review denied, 301 Or. 76, 717 P.2d 631 (1986); Techalloy Co., Inc. v. Reliance Ins. Co., 338 Pa.Super. 1, 12, 487 A.2d 820, 827 (Super.Ct. 1984); City of Milwaukee v. Allied Smelting Corp., 117 Wis.2d 377, 384, 344 N.W.2d 523, 527 (Ct.App. 1983).
The debate continues. Compare Broderick Inv. Co. v. Hartford Acc. & Indem. Co., 954 F.2d 601, 608 (10th Cir.1992); New Castle County v. Hartford Acc. and Indem. Co., 933 F.2d 1162, 1194 (3d Cir.1991), superseded by, 778 F. Supp. 812 (D.Del. 1991); Avondale Industries, Inc. v. Travelers Indem. Co., 887 F.2d 1200, 1205 (2d Cir.1989), cert. denied, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); Claussen v. Aetna Cas. & Sur. Co., 888 F.2d 747, 750 (11th Cir.1989); Aetna Cas. & Sur. Co. v. General Dynamics Corp., 783 F. Supp. 1199, 1210, (E.D.Mo. 1991); Mapco Alaska Petroleum, Inc. v. Central Nat'l Ins. Co. of Omaha, 784 F. Supp. 1454, 1460, 1991 WL 321954 [*]5 (D.Alaska 1991); Fireman's Fund Ins. Co. v. Meenan *205 Oil Co., 755 F. Supp. 547, 550 (E.D.N.Y. 1991) (applying New Jersey law); Time Oil Co. v. Cigna Property & Cas. Ins. Co., 743 F. Supp. 1400, 1408 (W.D.Wash. 1990); United States Fidelity and Guar. Co. v. Thomas Solvent Co., 683 F. Supp. 1139, 1156-59 (W.D.Mich. 1988); Pepper's Steel & Alloys, Inc. v. United States Fidelity and Guar. Co., 668 F. Supp. 1541, 1549 (S.D.Fla. 1987); Hecla Min. Co. v. New Hampshire Ins. Co., 811 P.2d 1083, 1091-92 (Colo. 1991); Claussen v. Aetna Cas. & Sur. Co., 259 Ga. 333, 335, 380 S.E.2d 686, 688 (1989); James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co., 814 S.W.2d 273, 281 (Ky. 1991); Grinnell Mut. Reinsurance Co. v. Wasmuth, 432 N.W.2d 495, 499-500 (Minn. Ct. App. 1988); State v. Aetna Cas. and Sur. Co., 155 A.D.2d 740, 547 N.Y.S.2d 452, 453 (App.Div. 1989); Kipin Industries, Inc. v. American Universal Ins. Co., 41 Ohio App.3d 228, 231-32, 535 N.E.2d 334, 338 (Ct.App. 1987); Just v. Land Reclamation, Ltd., 155 Wis.2d 737, 456 N.W.2d 570, 573 (1990); Fortier v. Flambeau Plastics Co., 164 Wis.2d 639, 476 N.W.2d 593, 609 (Ct.App.), review denied, 479 N.W.2d 172 (1991); Leverence v. United States Fidelity and Guar., 158 Wis.2d 64, 462 N.W.2d 218, 232 (Ct.App.), review denied, 464 N.W.2d 423 (1990); with Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156-57 (4th Cir.1992); Northern Ins. Co. of New York v. Aardvark Assocs., Inc., 942 F.2d 189, 193 (3d Cir.1991); Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 938 F.2d 1423, 1429 (1st Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992); State of New York v. Amro Realty Corp., 936 F.2d 1420, 1428 (2d Cir.1991); A. Johnson & Co., Inc. v. Aetna Cas. & Sur. Co., 933 F.2d 66, 72 (1st Cir.1991); Ogden Corp. v. Travelers Indem. Co., 924 F.2d 39, 42 (2d Cir.1991); Grant-Southern Iron & Metal Co. v. CNA Ins. Co., 905 F.2d 954, 956-57 (6th Cir.1990); International Surplus Lines Ins. Co. v. Anderson Dev. Co., 901 F.2d 1368, 1369 (6th Cir.1990); FL Aerospace v. Aetna Cas. & Sur. Co., 897 F.2d 214, 219 (6th Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990); United States Fidelity and Guar. Co. *206 v. Star Fire Coals, Inc., 856 F.2d 31, 34 (6th Cir.1988); Savoy Medical Supply Co., Inc. v. F & H Mfg. Corp., 776 F. Supp. 703, 707-08 (E.D.N.Y. 1991); Colonial Tanning Corp. v. Home Indem. Co., 780 F. Supp. 906 (N.D.N.Y. 1991); Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co., 781 F. Supp. 9, 14-15 (D.D.C. 1991); Anaconda Minerals Co. v. Stoller Chem. Co., Inc., 773 F. Supp. 1498, 1504 (D.Utah 1991); Olin Corp. v. Insurance Co. of North America, 762 F. Supp. 548, 560 (S.D.N.Y. 1991); United States Fidelity and Guar. Co. v. T.K. Stanley, Inc., 764 F. Supp. 81, 84-85 (S.D.Miss. 1991); CPC Intern., Inc. v. Northbrook Excess & Surplus Ins. Co., 759 F. Supp. 966, 973 (D.R.I. 1991); Hartford Acc. and Indem. Corp. v. United States Fidelity and Guar. Co., 765 F. Supp. 677, 680-81 (D.Utah 1991); A. Johnson & Co., Inc. v. Aetna Cas. & Sur. Co., 741 F. Supp. 298, 304-05 (D.Mass. 1990), aff'd, 933 F.2d 66 (1st Cir.1991); State of New York v. Blank, 745 F. Supp. 841, 844-45 (N.D.N.Y. 1990); Peerless Ins. Co. v. Strother, 765 F. Supp. 866, 871 (E.D.N.C. 1990); Upjohn Co. v. Aetna Cas. & Sur. Co., 768 F. Supp. 1186, 1201 (W.D.Mich. 1990); Detrex Chem. Indus., Inc. v. Employers Ins. of Wausau, 746 F. Supp. 1310, 1319 (N.D.Ohio 1990); United States Fidelity and Guar. Co. v. Morrison Grain Co., Inc., 734 F. Supp. 437, 446 (D.Kan. 1990); Industrial Indem. Ins. Co. v. Crown Auto Dealerships, Inc., 731 F. Supp. 1517, 1521 (M.D.Fla. 1990), question certified, 935 F.2d 240 (11th Cir.1991); Federal Ins. Co. v. Susquehanna Broadcasting Co., 727 F. Supp. 169, 176 (M.D.Pa. 1989), modified, 738 F. Supp. 896 (M.D.Pa. 1990), aff'd, 928 F.2d 1131 (3d Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 86, 116 L.Ed.2d 58 (1991); Ray Industries, Inc. v. Liberty Mut. Ins. Co., 728 F. Supp. 1310, 1316 (E.D.Mich. 1989); C.L. Hauthaway & Sons Corp. v. American Motorists Ins. Co., 712 F. Supp. 265, 268 (D.Mass. 1989); Firemen's Fund Ins. Co. v. Ex-Cell-O Corp., 702 F. Supp. 1317, 1326 (E.D.Mich. 1988); EAD Metallurgical, Inc. v. Aetna Cas. & Sur. Co., 701 F. Supp. 399, 402 (W.D.N.Y. 1988), aff'd, 905 F.2d 8 (2d Cir.1990); United States Fidelity and Guar. Co. v. *207 Korman Corp., 693 F. Supp. 253, 260-61 (E.D.Pa. 1988); Hayes v. Maryland Cas. Co., 688 F. Supp. 1513, 1515 (N.D.Fla. 1988); Centennial Ins. Co. v. Lumbermens Mut. Cas. Co., 677 F. Supp. 342, 349 (E.D.Pa. 1987); Borden, Inc. v. Affiliated FM Ins. Co., 682 F. Supp. 927, 930 (S.D.Ohio 1987), aff'd, 865 F.2d 1267 (6th Cir.1989), cert. denied, 493 U.S. 817, 110 S.Ct. 68, 107 L.Ed.2d 35 (1989); Outboard Marine Corp. v. Liberty Mut. Ins. Co., 212 Ill. App.3d 231, 244, 156 Ill.Dec. 432, 440, 570 N.E.2d 1154, 1162, appeal allowed, 139 Ill.2d 598, 159 Ill.Dec. 110, 575 N.E.2d 917 (1991); International Minerals & Chem. Corp. v. Liberty Mut. Ins. Co., 168 Ill. App.3d 361, 119 Ill.Dec. 96, 106-07, 522 N.E.2d 758, 768-69, appeal denied, 122 Ill.2d 576, 125 Ill.Dec. 218, 530 N.E.2d 246 (1988); Bentz v. Mutual Fire, Marine & Inland Ins. Co., 83 Md. App. 524, 436, 575 A.2d 795, 803 (Ct.Spec.App. 1990); Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 692, 555 N.E.2d 576, 579 (1990); Polkow v. Citizens Ins. Co. of Am., 438 Mich. 174, 186, 476 N.W.2d 382, 384 (1991); Upjohn Co. v. New Hampshire Ins. Co., 438 Mich. 197, 201, 476 N.W.2d 392, 397 (1991); Sylvester Brothers Dev. Co. v. Great Central Ins. Co., 480 N.W.2d 368, 376, 1992 WL 10634 [*]8 (Minn. Ct. App. 1992); Technicon Electronics Corp. v. American Home Assur. Co., 74 N.Y.2d 66, 75, 544 N.Y.S.2d 531, 533, 542 N.E.2d 1048, 1051 (1989); Town of Moreau v. Orkin Exterminating Co., Inc., 165 A.D.2d 415, 568 N.Y.S.2d 466, 469 (1991); County of Broome v. Aetna Casualty & Sur. Co., 146 A.D.2d 337, 341-425, 540 N.Y.S.2d 620, 622-23, appeal denied, 74 N.Y.2d 614, 547 N.Y.S.2d 848, 547 N.E.2d 103 (1989); Colonie Motors, Inc. v. Hartford Acc. and Indem. Co., 145 A.D.2d 180, 182, 538 N.Y.S.2d 630, 632 (1989); Powers Chemco, Inc. v. Federal Ins. Co., 144 A.D.2d 445, 447, 533 N.Y.S.2d 1010, 1011 (1988), aff'd, 74 N.Y.2d 910, 549 N.Y.S.2d 650, 548 N.E.2d 1301 (1989); Mays v. Transamerica Ins. Co., 103 Or. App. 578, 584, 799 P.2d 653, 657 (1990), review denied, 311 Or. 150, 806 P.2d 128 (1991); Lower Paxon Tp. v. United States Fidelity and Guar. Co., 383 Pa.Super. 558, 569-70, 557 A.2d 393, 398-99 (1989); Harleysville *208 Mut. Ins. Co. v. R.W. Harp and Sons, Inc., 409 S.E.2d 418, 419-20 (S.C. Ct. App. 1991).
Other than noting the litigation explosion that has been generated by the ambiguous wording of the pollution exclusion, we need not further address the issue. We merely add that we deem this case an inappropriate vehicle for consideration of the question.
Finally, we do not reach the issue of whether Diamond, as a "highly knowledgeable purchaser of insurance," had "substantial bargaining power" and deliberately negotiated an insurance agreement containing a pollution exclusion which was intended to deviate from the standard policy provision as construed in Broadwell. The Chancery Division judge recognized that he was bound by our holding in Broadwell. However, he found that "in purchasing the policies in question Diamond understood and expected that the pollution exclusion barred coverage for the kinds of claims which [ultimately arose] out of the operation of the Newark plant." Citing Werner Industries, Inc. v. First State Ins. Co., 112 N.J. 30, 38, 548 A.2d 188 (1988) and Zuckerman v. Nat. Union Fire Ins. Co., 100 N.J. 304, 320-21, 495 A.2d 395 (1985), the Chancery Division determined that, as a sophisticated insured, Diamond knew that its policies did not cover damage caused by the gradual discharge of pollutants.
We harbor reservations concerning this conclusion. Although the "sophistication" and "knowledge" of an insured may be a factor in determining whether an insurance policy is a "contract of adhesion," see Werner Industries, Inc. v. First State Ins. Co., 112 N.J. at 38, 548 A.2d 188, questions concerning the impact of this circumstance have received comparatively little attention. While our research discloses no reported New Jersey decision dealing with the precise issue, other jurisdictions have held that "the exception to the strict rule of construction applies only when the terms of the policy were negotiated between the parties...." Bank of West v. Superior *209 Court, 225 Cal. App.3d 121, 275 Cal. Rptr. 39, 47 (1990), vacated, 4 Cal. App.4th 1622, 226 Cal. App.3d 835, 233 Cal. App.3d 213, 277 Cal. Rptr. 219, review granted, 279 Cal. Rptr. 777, 807 P.2d 1006 (1991). Stated somewhat differently, only where it is clear that an insurance policy was "actually negotiated or jointly drafted," and where the policyholder had bargaining power and sophistication, is the rule of strict construction of policy terms against the insurer not invoked. AIU Ins. Co. v. FMC Corp., 51 Cal.3d 807, 274 Cal. Rptr. 820, 832, 799 P.2d 1253, 1265 (1990). See also Keating v. National Union Fire Ins. Co. of Pittsburgh, Pa., 754 F. Supp. 1431, 1437 (C.D.Cal. 1990); Northwest Airlines, Inc. v. Globe Indem. Co., 225 N.W.2d 831 (Minn. 1975); Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 784 P.2d 507, 514 (1990).
Within this analytical framework, we question whether the exception to the normal rule was properly applied in this case. Despite Diamond's sophistication, the critical fact remains that the policy in question was a standard form policy prepared by Aetna's experts, with language selected by the insurer. The specific language contained in the exclusion was not negotiated. It appears in policies issued to big and small businesses throughout the country. The use of standard policy provisions is founded upon the premise that collaboration among casualty insurers is necessary to calculate and maintain reasonable rates. It has been said that "unless companies combining loss experience statistics afford[] substantially the same coverage, the reported statistics [will] vary from minor distortions of true experience to an almost meaningless potpourri." James B. Donovan, Hardy Perennials of Insurance Contract Litigation, Ins.L.J. 163 (March 1954). It would seem that the benefits of this standardization would be lost if standard form language were given different meanings for different insureds based upon individual degrees of sophistication and bargaining power.
In the context of standard form provisions, the "highly sophisticated" insured exception adopted by the Chancery Division *210 tends to produce anomalous results. Invariably, the "highly sophisticated" insured is found to have negotiated an insurance contract providing protection inferior to that of his less urbane counterpart, although the language of the two policies is identical. The facts of this case are illustrative of the skewed result of applying the doctrine where the policy issued to the "highly sophisticated" insured contains standard form language. Long before our decision in Broadwell, Aetna had apparently construed the "sudden and accidental" exception to the pollution exclusion as referring only to unexpected events. In a speech to the American Bar Association, Francis X. Bruton, Jr., who participated on Aetna's behalf in drafting the casualty insurance industry's standard pollution exclusion, described the meaning of that clause in terms fairly comporting with our later Broadwell holding:
The [pollution] exclusion eliminates coverage if bodily injury or property damage arises out of the discharge, release or escape of pollutants unless, the discharge, dispersal, release or escape is sudden and accidental. The unless clause of this exclusion in the opinion of the underwriters allows them to perform their traditional function as insurers of the unexpected event or happening and yet does not allow an insured to seek protection from his liability insurer if he knowingly pollutes.
F.X. Bruton, Jr., Historical, Liability & Insurance Aspects of Pollution Claims, reprinted in PROBLEMS ARISING FROM ENVIRONMENTAL LITIGATION & LEGISLATION 303, 310-11 (ABA Sec.Ins.Neg. & Comp.L. 1971). There are other contemporaneous public expressions by Aetna's representatives disclosing their common understanding of the meaning of the standard pollution exclusion in accordance with Broadwell. In light of this evidence, it seems incongruous to hold Diamond to a stricter standard and less protection merely because it is a "sophisticated" insured.
We need not dwell upon the subject. Because the Chancery Division's judgment is sustainable on an entirely different basis, we need not pass on this or the other issues to which we have alluded.

*211 C.
We do not decide this case on the broader propositions suggested by the Chancery Division judge. Instead, we rest our holding on the judge's finding of fact that Diamond knowingly and routinely discharged contaminants over a period of 18 years. The judge determined that Diamond knew "the nature of the chemicals it was handling," knew that "they were being continuously discharged into the environment," and knew that "they were doing at least some harm." Given Diamond's "knowing and routine discharge of contaminants," the judge concluded that "the resulting injury and damage [were] expected from the standpoint of the assured...." We are entirely satisfied that these detailed findings were supported by adequate, substantial and credible evidence. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974); State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964); New Jersey Turnpike Auth. v. Sisselman, 106 N.J. Super. 358, 370, 255 A.2d 810, certif. denied, 54 N.J. 565, 258 A.2d 16 (1969). Indeed, the trial record admits of no other fair conclusion.
None of the insuring agreements covered Diamond's intentional and knowing polluting activity. Whether or not one subscribes to the Chancery Division judge's definition of "accident," it is plain beyond peradventure that the intentional and deliberate acts of the insured do not fall within the purview of the policy language. Whatever else may be said, the continuous release of dioxins from the plant was not "unforeseen," and the resulting damage was not "unexpected." Riker v. John Hancock Mut. Life Ins. Co., 129 N.J.L. at 511, 30 A.2d 42; see also United States Mut. Accident Ass'n v. Barry, 131 U.S. at 121, 9 S.Ct. at 762, 33 L.Ed. at 67. The "accident-based" policies issued by Aetna between 1951 and 1960 did not cover pollution resulting from Diamond's deliberate conduct.
We are equally satisfied that such losses were not covered by the "occurrence-based" policies issued by Aetna between 1960 *212 and 1985. The operative language of the insuring agreement contained in these policies reads in pertinent part as follows:
"Occurrence" means
(A) An accident, or
(B) Continuous or repeated exposure to conditions which results, during the policy period, in injury to persons or tangible property which is neither expected nor intended from the standpoint of the insured. (emphasis added).
Unfortunately, this "occurrence-based" language has spawned a substantial amount of litigation. Although the issue has received uneven treatment and has yet to be authoritatively resolved by our Supreme Court, see Ambassador Ins. Co. v. Montes, 76 N.J. 477, 388 A.2d 603 (1978), we have said that similarly worded insuring agreements provided coverage for "unintended results of intentional acts." Prudential Property and Cas. Ins. Co. v. Karlinski, 251 N.J. Super. 457, 463, 598 A.2d 918 (1991); see also Atlantic Employers Ins. Co. v. Tots & Toddlers Pre-School Day Care Center, Inc., 239 N.J. Super. 276, 281-82, 571 A.2d 300, certif. denied, 122 N.J. 147, 584 A.2d 218 (1990); Lyons v. Hartford Ins. Group, 125 N.J. Super. 239, 245, 310 A.2d 485 (1973), certif. denied, 64 N.J. 322, 315 A.2d 411 (1974); cf. Allstate Ins. Co. v. Schmitt, 238 N.J. Super. 619, 623, 570 A.2d 488, certif. denied, 122 N.J. 395, 585 A.2d 394 (1990).
Seizing upon this language, Diamond contends that it did not subjectively desire to contaminate the environment. This claim is wholly at odds with the evidence. As we noted earlier, Diamond's management knew of the hazardous nature of dioxins at a relatively early stage. In the Autumn of 1959, Diamond's representative, Thorton Holder, offered a two-step process by which dioxins could be eliminated, or at least reduced, in the manufacturing process. Despite specific preventive recommendations, Diamond made a conscious decision to run the autoclave, in which chemicals were processed into TCP, at a higher temperature than suggested by Holder. The reason for its decision is obvious. When the temperature in the autoclave was reduced, the reaction time was prolonged, resulting *213 in a decrease in the volume of production. The general rule was that a reduction in temperature of ten degrees reduced the reaction time by 50%. The only conclusion to be drawn is that Diamond's management was wholly indifferent to the consequences flowing from its decision. Profits came first.
Diamond's sporadic attempts to deal with the dioxin problem were too little and too late. As we mentioned in our recital of the facts, a carbon absorption system was devised and installed in September 1967. The carbon tower was able to remove dioxin at or below one part per million. Nevertheless, Diamond employees acknowledged that monthly readouts starkly revealed the inadequacy of this approach. Indeed, in October 1968 the level was 8.4 parts per million; November 1968 was 9.3 parts per million, and December 1968 was 9.6 parts per million. Diamond's employees admitted that "cooking" the TCP in the autoclave at 170 degrees centigrade occasionally produced TCP with 80 parts per million dioxin contamination. Additionally, a government document entitled "Herbicide Stock at Gulfport, Mississippi" indicates that, of the government's stockpile of Agent Orange, the average dioxin content of the product manufactured by Diamond was greater than that of the product manufactured by the four other companies whose products were stored at that location.
Despite the certain and documented dangers of the dioxin produced in the TCP process, Diamond treated this substance no differently than it treated any of the nonchloracnegen-containing products. Both the air and the ground, inside and outside of the Lister Avenue plant, were regularly subjected to dioxin emissions through venting, and contamination from spills, leaks and "sloppy practices" in and around the plant.
Overwhelming evidence was presented that Diamond knew about the release of dioxins from its plant and the migration of these substances to surrounding areas. Frederick Steward, technical superintendent of the plant between 1966 and 1969, acknowledged that as far back as 1965 he considered dioxin to *214 be hazardous material because it was the known cause of chloracne. Contaminants, including dioxin from the TCP process, were regularly vented directly into the atmosphere from the autoclave and another piece of equipment, the anisole drop tank. In a deposition, James Worthington, Diamond's manager of scientific services, acknowledged that dioxin indeed entered the environment through some of the plant's air vents. A former Diamond employee, Nicholas Centanni, testified that a grayish cloud of smoke would come out of the scrubber, which was attached to the TCP process building. The cloud of smoke would flow into the atmosphere but residue from the smoke would settle on employee cars in the parking lot causing the paint "to pit"  to look as if acid had been thrown on the cars. Anthony Wolfskill, a geotechnical engineer employed by an environmental science consulting firm which studied the contamination at the Lister Avenue plant, confirmed that dioxin was released into the atmosphere through the scrubbers.
Several witnesses testified that leaks and spills in the TCP process area and the handling of the TCP and dioxin-laden products outside of the building were commonplace. As we noted, Chester Myko who worked at the plant since 1954 until it closed, characterized the 2,4,5-T building where the Agent Orange was manufactured as the "dirtiest place in the whole plant." The Agent Orange was always on the floor; it solidified into a slippery oil film that made normal walking impossible. To move one had to "sort of slide along" instead of taking steps. The floor was not cleaned daily. Rather, every other week or so it was washed down with sulfuric acid. As we mentioned previously, the sulfuric acid wash damaged the concrete floor, turning it to dust. Therefore, every few years the company installed a new concrete floor. The floor was then hosed down and the water directed into trenches which ran directly into the river or into an industrial sewer. However, many times the trenches would block up, sometimes by trash, but generally by the chemical material which would solidify. *215 The liquid would back up onto the building floor or spill out of the trenches and onto the surrounding ground.
We have already described the leaks in the pipes and the manner in which the ground outside of the plant became permeated with hazardous substances. We have also described the manner in which railway cars were cleaned and the residue drained into the ground.
We recognize that we should not judge Diamond's conduct from the vantage point of twenty-twenty hindsight. The critical fact remains, however, that Diamond knew it was dealing with a toxic substance. Perhaps it was not aware of the exact extent of the dangerous consequences emanating from its polluting activity. However, we cannot ignore reality by accepting the blithe assurance of Diamond that it did not intend to injure others. The evidence abounds the other way.
We need not engage in the debate whether an intent to inflict injury can be inferred as a matter of law. See Lyons v. Hartford Ins. Group, 125 N.J. Super. at 246-47, 310 A.2d 485; Oakes v. State Farm Fire & Cas. Co., 137 N.J. Super. 365, 368, 349 A.2d 102 (1975), certif. denied, 70 N.J. 142, 358 A.2d 189 (1976); Pendergraft v. Commercial Standard Fire & Marine Co., 342 F.2d 427, 429 (10th Cir.1965); Stout v. Grain Dealers Mut. Ins. Co., 307 F.2d 521, 525 (4th Cir.1962); Western World Ins. Co. v. Hartford Mut. Ins., 600 F. Supp. 313, 319 (D.Md. 1984); Travelers Indem. Co. v. Walburn, 378 F. Supp. 860, 867 (D.D.C. 1974); Truck Ins. Exchange v. Pickering, 642 S.W.2d 113, 116 (Mo. App.Ct. 1982); Heshelman v. Nationwide Mut. Fire Ins. Co., 412 N.E.2d 301, 302 (Ind. App.Ct. 1980); Caspersen v. Webber, 298 Minn. 93, 213 N.W.2d 327, 330 (1973); State Farm Fire & Cas. Co. v. Victor, 232 Neb. 942, 442 N.W.2d 880, 883 (1989); McDonald v. United Pacific Ins. Co., 210 Or. 395, 311 P.2d 425, 432 (1957). Instead, we are convinced that subjective knowledge of harm was proven as a matter of fact. The Chancery Division judge so found, and we agree that this conclusion is virtually inescapable.

*216 D.
Diamond contends that it is entitled to coverage concerning its losses which occurred when the TCP process building exploded in 1960 and when contamination spread to the Brady Iron Works in 1981. According to Diamond, these "occurrences" were clearly unintended and unexpected, and plainly fell within the coverage of the policies then in existence.
We recognize that generally it is the insurer which bears the burden of demonstrating that a loss falls outside the scope of coverage. See United Rental Equipment Co. v. Aetna Life and Cas. Ins. Co., 74 N.J. 92, 99, 376 A.2d 1183 (1977); see also Butler v. Bonner & Barnewall, Inc., 56 N.J. 567, 576, 267 A.2d 527 (1970); Burd v. Sussex Mut. Ins. Co., 56 N.J. 383, 399, 267 A.2d 7 (1970). The insured must first show, however, that he suffered a loss. In that context, Diamond failed to prove that the 1960 explosion caused either on-site or off-site contamination. In his deposition, the plant manager, John Burton, testified that the fire and explosion "presumably generated enough temperature to destroy the dioxin." This was essentially repeated in his trial testimony.
Contamination of the Brady Iron Works presents a different problem. The record supports the conclusion that, given Diamond's knowledge of the continuous and large-scale pollution emanating from its plant, it also knew that migration of hazardous substances was inevitable. Perhaps Diamond hoped that neighboring properties would be spared. However, Diamond's deliberate course of pollution constituted intentional conduct with the corresponding intentional injury inextricably intertwined.

III.
We now turn to Diamond's claim for indemnification of its contribution to the Agent Orange Settlement. In the principal appeal, Diamond argues that (1) the insurers are jointly and severally liable, (2) the Chancery Division's allocation of losses was unreasonable and was not supported by the evidence, (3) *217 the court erred by applying one per occurrence limit for each three-year excess policy when the three-year primary policy applied its occurrence limit separately for each year, and (4) its one month extension was erroneously construed as affording no additional protection. In their cross-appeal, the insurers contend that (1) the Agent Orange settlement fell within the war risk exclusion, (2) the veterans' claim for bodily injury was never established in the underlying litigation, (3) the Chancery Division incorrectly construed the "batch clause" limitation, (4) much of the loss was covered by foreign risk policies, and the amounts of coverage which were forfeited because Diamond failed to give timely notice to those insurers should be deducted from the amounts owed by the excess carriers, and (5) the excess carriers should not have been held liable for prejudgment interest.
We reject all of Diamond's arguments presented in the principal appeal. With respect to the cross-appeal, we conclude that the loss incurred by Diamond fell squarely within the war risk exclusion provided in several of the policies issued by the excess providers. Specifically, our exhaustive examination of the record has led us to the inescapable conclusion that the exposure of military personnel to Agent Orange and the resulting injuries were "directly or indirectly occasioned by" or "in consequence of" the war in Vietnam. We find that the injuries sustained were the result of a hazard incidental to the military engagement of the United States government and were made more likely and probable by the demands of war. We conclude that, with two exceptions, there is no merit in the remaining contentions advanced in the cross-appeal. We direct that the Chancery Division reconsider the potential applicability of the policies issued by the foreign risk providers. We also modify the award of prejudgment interest.

A.
We first discuss a preliminary point of some importance. Unlike Diamond's Lister Avenue dioxin claim, we hold *218 that New York law is applicable to the Agent Orange settlement. We thus apply New York law in analyzing the issues raised in the principal appeal and cross-appeal.
We need not trace in detail the history of choice of law principles in contract cases. Over the years, interpretation of insurance policies has traditionally been governed by the law of the place of contracting. See, e.g., Buzzone v. Hartford Acc. and Indem. Co., 23 N.J. 447, 452, 129 A.2d 561 (1957). However, as we pointed out in our discussion of the choice of law problem pertaining to the dioxin claim, mechanical application of the traditional rule can lead to unjust results not fairly envisioned by the contracting parties and inconsistent with the fundamental policies and interests of the forum state. What has evolved is a more flexible approach which focuses upon the state which has the most meaningful connections with the transactions and the parties. State Farm Mut. Auto Ins. Co. v. Simmons' Estate, 84 N.J. at 35, 417 A.2d 488. As we noted in Bell v. Merchants & Businessmen's Mut. Ins. Co., "[t]his evolution parallels that in other areas of the law in which our Supreme Court has eschewed slavish devotion to rigid principles in favor of a more realistic governmental interest analysis in choice of law decisions." Id. at 562; State v. Curry, 109 N.J. 1, 7, 532 A.2d 721 (1987); Veazey v. Doremus, 103 N.J. 244, 247, 510 A.2d 1187 (1986); Pfau v. Trent Aluminum Co., 55 N.J. 511, 514-15, 263 A.2d 129 (1970); Mellk v. Sarahson, 49 N.J. 226, 228-29, 229 A.2d 625 (1967); Mueller v. Parke Davis, 252 N.J. Super. 347, 351, 599 A.2d 950 (App.Div. 1991); State v. Engel, 249 N.J. Super. 336, 362, 592 A.2d 572 (App.Div. 1991).
The proper approach in resolving choice of law issues in liability insurance controversies was discussed in State Farm Mut. Auto Ins. Co. v. Simmons' Estate, 84 N.J. at 37, 417 A.2d 488. As we noted earlier, our Supreme Court called for recognition of the rule that "the law of the place of the contract ordinarily governs the choice of law...." Ibid. We perceive no sound basis to depart from that principle in the context of Diamond's Agent Orange claim. New York, the place of the *219 contract, bears the most meaningful and significant relationship to the issues presented. The contracts were negotiated and, for the most part, executed in New York through the brokerage efforts of Alexander & Alexander. Most of the policies issued by the carriers covered nationwide risks. The only common ground between Diamond and its insurers is the place where the contracts were procured, Diamond's brokerage firm in New York. As between New York and New Jersey, the former has the more significant contacts with the dispute. We thus apply New York law.
One further matter should be noted before leaving the subject. This pertains solely to our discussion of the war risk clause in the context of the cross-appeal. As we will describe more fully, the New York courts have resolved issues pertaining to war and military risk exclusionary clauses very similar to that in this case. Although New Jersey has had some experience in deciding questions concerning the validity and reach of war risk exclusions, see, e.g., Jorgenson v. Metropolitan Life Ins. Co., 136 N.J.L. 148, 55 A.2d 2 (Sup.Ct. 1947); Caruso v. John Hancock Mut. Life Ins. Co., 25 N.J. Misc. 318, 53 A.2d 222 (Sup.Ct. 1947), aff'd, 136 N.J.L. 597, 57 A.2d 359 (E. & A. 1948), we have found no reported New Jersey decision dealing with the precise issue. We stress, however, that although we rely principally on New York decisions in disposing of the issue regarding the war risk exclusion, we discern no reason why New Jersey law would be different.
In New Jersey, "we have consistently construed policy terms strictly against the insurer." Allen v. Metropolitan Life Ins. Co., 44 N.J. at 305, 208 A.2d 638. "If the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied." Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, Switzerland, 35 N.J. at 7, 170 A.2d 800. It has been said that we are "bound to protect the insured to the full extent that any fair interpretation will allow." Ibid. In evaluating an insurer's claim concerning policy terms, we always *220 have considered "whether alternative or more precise language, if used, would have put the matter beyond reasonable question ...." Ibid. However, our Supreme Court has observed that "canons of construction dictating interpretation against a drafter `should be sensible and in conformity with the expressed intent of the parties.'" Werner Industries, Inc. v. First State Ins. Co., 112 N.J. at 38, 548 A.2d 188 (quoting Broadway Maintenance Corp. v. Rutgers, State Univ., 90 N.J. 253, 271, 447 A.2d 906 (1982)). Such canons "should not be used as excuse to read into a private agreement that which is not there, and that which people dealing fairly with one another could not have intended." Tomaiuol v. United States Fidelity and Guar. Co., 75 N.J. Super. 192, 207, 182 A.2d 582 (App.Div. 1962).
We digress to mention these principles because they are no different than those developed by the New York courts in resolving disputes concerning the interpretation of insurance contracts. See, e.g., Drilling v. New York Life Ins. Co., 234 N.Y. 234, 241, 137 N.E. 314, 316 (1922). Against this backdrop, we find the New York decisions dealing with war risk claims highly persuasive. Even were we to apply New Jersey law, we would develop the same principles in construing the war risk exclusion in this case. To that extent, even if we are wrong in our choice of law holding, we find alternatively that the issue presents a "false conflict," because application of New Jersey law would yield the same result. Mueller v. Parke Davis, 252 N.J. Super. at 355, 599 A.2d 950.

B.
We first consider the issues raised in the principal appeal. We then examine the questions presented by the cross-appeal.
We find no merit in any of the arguments advanced in the principal appeal. Initially, we reject Diamond's contention that the insurers should have been held jointly and severally liable for the Agent Orange settlement. In support of its *221 position, Diamond relies upon cases in which a single, indivisible injury resulted from exposure to a substance or ingestion of a drug over the course of several policy periods. See, e.g., Dayton Independent School Dist. v. National Gypsum Co., 682 F. Supp. 1403, 1409-10 (E.D.Tex. 1988), rev'd sub nom., W.R. Grace & Co. v. Continental Cas. Co., 896 F.2d 865 (5th Cir.1990); Lac D'Amiante du Quebec, Ltee. v. American Home Assur. Co., 613 F. Supp. 1549, 1561-63 (D.N.J. 1985); Sandoz, Inc. v. Employer's Liability Assur. Corp., 554 F. Supp. 257, 266 (D.N.J. 1983); American Home Prod. Corp. v. Liberty Mut. Ins. Co., 565 F. Supp. 1485, 1502-03 (S.D.N.Y. 1983), aff'd, 748 F.2d 760 (2d Cir.1984). Given the indivisible nature of the injury or disease, it was impossible in these cases, as a practical matter, to determine which exposure or exposures constituted the causative agent or agents. Because there was no medical technique capable of specifically identifying and quantifying the extent to which each exposure contributed to the injury or disease, proration was impossible. In this situation, imposition of joint and several liability upon the insurers was considered to be the only feasible means of apportioning responsibility. See Lac D'Amiante du Quebec, Ltee. v. Am. Home Assur., 613 F. Supp. at 1559-63.
In contrast, it has been said that "[i]t is only where the evidence cannot specifically identify and quantify the injury actually sustained during the policy period that some fair and appropriate means of allocation, [generally imposition of joint and several liability], must be developed." Sandoz, Inc. v. Employer's Liability Assur. Corp., 554 F. Supp. at 266. "A carrier would not normally be held liable for injuries sustained before its coverage commenced or after it terminated." Ibid. Apportionment is necessary where there exists a reasonable means of allocating the harm over the applicable policy periods. We note that New York law does not impose joint and several liability upon insurers who have issued successive policies. See Levine v. Lumbermen's Mut. Cas. Co., 147 A.D.2d 423, 149 A.D.2d 372, 538 N.Y.S.2d 263 (App.Div. 1989); National Cas. *222 Ins. Co. v. City of Mount Vernon, 128 A.D.2d 332, 515 N.Y.S.2d 267 (App.Div. 1987); cf. Federal Ins. Co. v. Cablevision Systems Dev. Co., 836 F.2d 54, 58 (2d Cir.1987); National Grange Mut. Ins. Co. v. Continental Cas. Ins. Co., 650 F. Supp. 1404, 1413 (S.D.N.Y. 1986); Federal Ins. Co. v. Atlantic Nat'l Ins. Co., 25 N.Y.2d 71, 78-79, 302 N.Y.S.2d 769, 774, 250 N.E.2d 193, 196 (1969); Jefferson Ins. Co. of New York v. Glen Falls Ins. Co., 88 A.D.2d 925, 926, 450 N.Y.S.2d 888, 890 (App.Div. 1982); Atlantic Mut. Ins. Co. v. Atlantic Nat'l Ins. Co., 38 A.D.2d 517, 518, 326 N.Y.S.2d 438, 439 (App.Div. 1971), aff'd, 33 N.Y.2d 817, 350 N.Y.S.2d 909, 305 N.E.2d 917 (1973).
That leads us to Diamond's assertion that the allocation formula applied by the Chancery Division was unreasonable. As we mentioned earlier, the Chancery Division applied the analytical framework devised by Judge Weinstein in Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. at 1388-89. In Uniroyal, Judge Weinstein determined that New York law required application of the "injury in fact" theory. Id. at 1388. Under that theory, "coverage [is] based upon the occurrence during the policy period of an injury in fact." American Home Products Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 764 (2d Cir.1984). Under New York law, "a real but undiscovered injury, proved in retrospect to have existed at the relevant time, would establish coverage, irrespective of the time the injury became [diagnosable]." Id. at 766. At least to some extent, the "injury in fact" principle in toxic tort cases requires a finding as to when "a foreign molecule causes an insult to human tissue." Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. at 1388. This theory is in contrast to the "continuous trigger" principle expounded in Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034 (D.C. Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), and applied in New Jersey, see Gottlieb v. Newark Ins. Co., 238 N.J. Super. 531, 570 A.2d 443 (App.Div. 1990). This theory holds that where an injury process is not a definite, discrete event, the date of the occurrence should be the continuous period from exposure to manifestation of damage. *223 In attempting to determine the date of injury in fact, Judge Weinstein relied upon medical affidavits and stipulations which revealed that personnel were exposed to Agent Orange in Vietnam four months after the delivery of that substance to the military. Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. at 1389.
In our view, the allocation formula devised in Uniroyal is entirely reasonable. Applied here, once the monetary loss per gallon is calculated and the date and dollar value fixed for each year of shipment, the loss is to be paid by one or more of the policies in force for that period. When primary coverage is exhausted, the loss travels the layers of excess policies in force on that date until the claim is paid. Although this determination is not precise, it is based on reasonably reliable evidence that the injury more likely than not occurred at the legally relevant time. American Home Prod. v. Liberty Mut. Ins. Co., 565 F. Supp. at 1509. The evidence supporting Judge Weinstein's formula was similar in quality to that advanced in other toxic tort insurance cases. See Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1222 (6th Cir.1980), clarified, 657 F.2d 814 (6th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). We are convinced that the formula yielded a fair and reasonable result in the context of the facts here.
We recognize that the Chancery Division did not have before it the affidavits and other documentary submissions that were produced in the Uniroyal case. We add that we know of no evidentiary rule that would permit judicial notice of this material. See Evid.R. 9(2)(b); cf. RWB Newton Associates v. Gunn, 224 N.J. Super. 704, 710-11, 541 A.2d 280 (App.Div. 1988). We also acknowledge the danger of uncritically accepting representations concerning documentary evidence presented in an entirely different court in an unrelated case. If the insurers were to attack the accuracy or existence of this evidence, *224 we would undoubtedly be obliged to reverse and remand for a plenary hearing.
The fact remains, however, that the insurers do not really challenge the underlying data upon which Judge Weinstein, and thus the Chancery Division, relied. Instead, they attack the conclusions reached. From all that appears in the insurers' briefs, the same materials presented in Uniroyal would be produced at a hearing were we to remand the matter to the Chancery Division. We perceive no sound basis to reverse and require what all agree would be a wholly unnecessary hearing with the attendant delay and cost. Although we are concerned with the "shortcut" taken by the Chancery Division and suggest that in the future liberal use of stipulations would be the better practice, we are nevertheless convinced that no prejudice resulted and that the correct result was reached.
Diamond next contends that the Chancery Division erroneously applied one per occurrence limit for each three-year excess policy. It is argued that the occurrence limits should have been annualized, as in Diamond's primary policies. We disagree.
The short answer to Diamond's argument is that the primary and excess policies contain different language in their respective limitations. Aetna and many of the excess providers issued several policies with three-year terms. Aetna's policy limits clause provided:
A policy period of three years is comprised of three consecutive annual periods.... Computation and adjustment of earned premiums shall be made at the end of each annual period. Aggregate limits of liability as stated in this policy shall apply separately to each annual period.
Unfortunately, none of the excess insurance policies contained a similar clause. The excess providers agreed to indemnify Diamond for those sums which it became liable to pay because of personal injuries or property damage "arising out of an occurrence happening during the contract period." The contract or policy period in each of the relevant excess policies is a three year period. Thus, coverage is extended to all *225 injuries during the policy period which arise out of an occurrence, subject to any policy limits for each occurrence. As to applicable policy limits, the excess policies restrict liability to the "ultimate net loss in excess of the amount recoverable under underlying insurance" but "then only up to a further [dollar amount] in respect of each occurrence." An "occurrence" is defined in the same manner as the primary policy, but it specifically refers to the policy period.
Thus, the excess policies establish a single limit of liability for an occurrence without regard to whether the injury or injuries attributable to the occurrence take place at the same time, in one year, or over three years. Moreover, the excess policies do not contain an aggregate limit. Diamond has coverage under the excess policies up to the per occurrence limits for an unlimited number of occurrences during the three year policy period.
We agree with the Chancery Division's observation that Diamond's primary policy "had a three year term that specifically divided itself into periods of one year for the purpose of fixing aggregate limits on liability," whereas none of the excess policies contained a provision for annualization or included an aggregate limit on liability. As we have emphasized, the limit of liability in the excess policies did not "follow form," but instead was fixed per occurrence. Accordingly, we are in accord with the Chancery Division's determination that there is a single occurrence limit for each three year policy period.
Finally, we find no merit in Diamond's claim that the one month extension of the policy issued by American Re-Insurance Company created additional coverage in the amount of $3 million per occurrence for all injuries allocated to this one month period. We agree with the Chancery Division that the result of this brief extension was simply to provide an additional 30 day period of coverage, extending the same per occurrence limit for the additional month. This was an extension of an existing policy, not the issuance of a new one. The extension *226 was intended to permit Diamond to obtain coverage elsewhere. The binder makes it clear that no new policy was issued. The effect of the extension was to continue the policy in force, not to increase coverage.

C.
We now turn to the issues raised by the cross-appeal. We begin with the war risk exclusion contained in several of the policies issued by the excess providers. We then discuss the remaining issues.

1.
We commence our analysis with the operative language of the exclusion. It reads:
[This contract shall not apply] except in respect of occurrences taking place in the United States of America ... to any liability of the Assured directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority. (emphasis added).
Two distinct questions are presented. It first must be determined whether the "occurrence" took place in the United States. If it did, the exclusion, by its very terms, is inapplicable. If the "occurrence" happened outside of the United States, we must decide whether the "liability of the assured [was] directly or indirectly occasioned by, happen[ed] through or [was] in consequence of war."

a.
Initially, we hold that the "occurrence," that is the "accident" or "repeated exposure" resulting in injury, happened in Vietnam and not in the United States. Our conclusion comports with the decisions of other states dealing with the issue of where an occurrence takes place. The courts have applied different principles of law in determining the time, number and place of the occurrence or occurrences. We emphasize *227 that the question here relates to the "whereabouts" of an occurrence. In this respect, the courts have uniformly held that the focal point of an "occurrence" or "accident" is the place of injury, as opposed to the place where the cause of the harm happened.
In New York, and throughout the country, the courts have held that a compensable occurrence comes into existence at the time of the injury. See American Home Products Corp. v. Liberty Mutual Ins. Co., 565 F. Supp. 1485, 1497 (S.D.N.Y. 1983), aff'd as modified, 748 F.2d 760 (2d Cir.1984); Transamerica Ins. Co. v. Bellefonte Ins. Co., 490 F. Supp. 935, 939 (E.D.Pa. 1980) (applying New York law); Holmes Protection of New York, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 152 A.D.2d 496, 543 N.Y.S.2d 459, 460 (App.Div. 1989); National Cas. Ins. Co. v. City of Mt. Vernon, 128 A.D.2d 332, 515 N.Y.S.2d 267, 270 (App.Div. 1987); Van Wyck Assoc. v. St. Paul Fire & Marine Ins. Co., 115 Misc.2d 447, 454 N.Y.S.2d 266, 269 (Sup.Ct. 1982), aff'd, 95 A.D.2d 989, 464 N.Y.S.2d 617 (App.Div.), appeal denied, 60 N.Y.2d 559, 470 N.Y.S.2d 1025, 458 N.E.2d 1261 (1983); American Motorists Ins. Co. v. E.R. Squibb & Sons, Inc., 95 Misc.2d 222, 406 N.Y.S.2d 658, 659-60 (Sup.Ct. 1978); see also Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 62 (3d Cir.1982); Eagle-Picher Indus., Inc. v. Liberty Mutual Ins. Co., 523 F. Supp. 110, 114 (D.Mass. 1981), modified, 682 F.2d 12 (1st Cir.1982), cert. denied, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983); Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 27, 483 A.2d 402 (1984); Gottlieb v. Newark Ins. Co., 238 N.J. Super. 531, 536, 570 A.2d 443 (App.Div. 1990); Meeker Sharkey Assocs., Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 208 N.J. Super. 354, 357-58, 506 A.2d 19 (App.Div. 1986); Deodato v. Hartford Ins. Co., 143 N.J. Super. 396, 402, 363 A.2d 361 (Law Div. 1976), aff'd, 154 N.J. Super. 263, 381 A.2d 354 (App.Div. 1977); Muller Fuel Oil Co. v. Ins. Co. of N. Am., 95 N.J. Super. 564, 578-79, 232 A.2d 168 (App.Div. 1967).
*228 In contrast, where there are multiple injuries, the courts in New York and elsewhere have determined the number of occurrences by focusing upon the cause or causes which gave rise to the harm. See Michaels v. Mut. Marine Office, Inc., 472 F. Supp. 26, 29 (S.D.N.Y. 1979); Hartford Acc. & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 899, 305 N.E.2d 907, 910 (1973); Arthur A. Johnson Corp. v. Indem. Ins. Co., 7 N.Y.2d 222, 196 N.Y.S.2d 678, 683, 164 N.E.2d 704, 708 (1959); Bethpage Water Dist. v. S. Zara & Sons, 154 A.D.2d 637, 546 N.Y.S.2d 645, 646 (App.Div. 1989); Allied Grand Doll Mfg. Co. v. Globe Indem. Co., 15 A.D.2d 901, 225 N.Y.S.2d 595, 596 (App.Div. 1962); see also Michigan Chem. Corp. v. American Home Assur. Co., 728 F.2d 374, 379 (6th Cir.1984); Maurice Pincoffs Co. v. St. Paul Fire and Marine Ins. Co., 447 F.2d 204, 206-07 (5th Cir.1971); Barrett v. Iowa Nat'l Mut. Ins. Co., 264 F.2d 224, 227 (9th Cir.1959); St. Paul-Mercury Indem. Co. v. Rutland, 225 F.2d 689, 693 (5th Cir.1955); Bartholomew v. Insurance Co. of N. Am., 502 F. Supp. 246, 251 (D.R.I. 1980), aff'd sub. nom. Bartholomew v. Appalachian Ins. Co., 655 F.2d 27 (1st Cir.1981); Transport Ins. Co. v. Lee Way Motor Freight, Inc., 487 F. Supp. 1325, 1330 (N.D.Tex. 1980) (Lloyd's policy language); American Cas. Co. of Reading, Pa. v. Heary, 432 F. Supp. 995, 997 (E.D.Va. 1977); Union Carbide Corp. v. Travelers Indem. Co., 399 F. Supp. 12, 21 (W.D.Pa. 1975); Doria v. Ins. Co. of North America, 210 N.J. Super. 67, 72-73, 509 A.2d 220 (App.Div. 1986).
In a variety of related settings, the courts have consistently held that the place where the injury happened is the location of the occurrence. See Dowden v. Security Ins. Co. of New Haven, 378 F.2d 46, 48 (5th Cir.1967); Upper Columbia River Towing Co. v. Maryland Cas. Co., 313 F.2d 702, 705 (9th Cir.1963); Service Welding & Mach. Co. v. Michigan Mut. Liab. Co. of Detroit, Mich., 311 F.2d 612, 618 (6th Cir.1962); Foremost Ins. Co. v. Eanes, 134 Cal. App.3d 566, 571, 184 Cal. Rptr. 635, 638 (Ct.App. 1982); Keystone Automated Equipment Co., Inc. v. Reliance Ins. Co., 369 Pa.Super. 472, 535 *229 A.2d 648, 655 (Super.Ct.), appeal denied, 519 Pa. 654, 546 A.2d 59 (1988); cf. Hagen Supply Corp. v. Iowa Nat. Mut. Ins. Co., 331 F.2d 199, 202 (8th Cir.1964); Bitts v. General Accident Fire & Life Assur. Corp., 282 F.2d 542, 543 (9th Cir.1960); Smith v. Maryland Cas. Co., 246 Md. 485, 229 A.2d 120, 122-23 (Ct.App. 1967); Union Indem. Ins. Co. of New York, 140 Misc.2d 702, 531 N.Y.S.2d 936, 939 (Sup.Ct. 1988), aff'd, 151 A.D.2d 301, 544 N.Y.S.2d 262 (App.Div. 1989); Blohm v. Glens Falls Ins. Co., 231 Or. 410, 373 P.2d 412, 416 (1962). In these cases, it has been said that "the focal point of coverage is not the place of the negligence, but the place of the accident," i.e., where the injury occurred. Dowden v. Security Ins. Co. of New Haven, 378 F.2d at 48.
Keystone Automated Equip. v. Reliance is illustrative. There, Keystone was sued for negligence in selling and installing equipment that was to be used to produce oil drums. The equipment was to be installed in a plant on the Ivory Coast of Africa. The purchaser of the machinery claimed, among other things, that Keystone was negligent in the production and design of the equipment, apparently resulting in losses in Africa. After settling the underlying litigation, Keystone instituted suit against Reliance, its insurer. Reliance asserted that the damage did not occur within the "policy territory," which was defined in the insurance contract as "the United States of America, its territories or possessions, or Canada." Id. 535 A.2d at 649. The policy covered losses arising out of an "occurrence," which was defined as "an accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the insured." Ibid. The court held that the occurrence had taken place outside of the United States and was, therefore, not covered. Id. at 655. In reaching this conclusion, the court acknowledged the different tests applicable to determining when an occurrence happens and the number of occurrences. Id. at 650-51. Noting that the "cause" test determines the number of occurrences where there *230 are multiple injuries, Id. at 650, the court held that the "`effect' test is applicable to a determination of place of occurrence as well as of time." Id. at 651. The court reasoned that the place of the injury, rather than the place of its cause, determines the "whereabouts of the accident [or occurrence]." Id. at 653.
Other courts construing similar policies have had little difficulty in separating injury from the events which give rise to the harm. In Hagen Supply Corp. v. Iowa Nat'l Mut. Ins. Co., for example, Hagen was sued by a minor injured when a tear gas device was discharged. It was alleged that Hagen was negligent in selling the device. The accident and resulting injury occurred off the premises of the insured's plant. The insurer refused to defend because the policy coverage was confined to onsite accidents. After Hagen lost the suit, it instituted an action against the insurer, arguing that the place of the negligent act  the sale which was the proximate cause of the injury  was controlling, and the place of the injury should be immaterial. The Court of Appeals for the Eighth Circuit disagreed. Id. at 202. Failing to find a duty to defend, the court stated, "the question to be resolved here concerns the place where the accident occurred, not the proximate cause of it." Ibid. The Court held that the occurrence took place where the injury was sustained and thus the insured's on-site coverage was not applicable. See also Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d at 61-62
The Court of Appeals for the Fifth Circuit reached the same conclusion in Dowden v. Security Ins. Co. of New Haven, 378 F.2d at 48. There, the policy contained an exclusion barring coverage "if the accident occurs away from the [insured's] premises...." Ibid. As phrased by the court, "[t]he question presented [was] whether ... the liability policy ... provid[ed] coverage to [the insured] for liability arising out of an accident taking place on a public highway attributable to negligence occurring on the premises of [the insured]." Id. at 47. The court held that the reference point in determining the place of *231 the "occurrence" was not the place of the negligence, but the place of the "accident." Id. at 48.
Of course, these decisions are by no means dispositive. We cite them merely to illustrate the well settled principle that the location of the injury, as opposed to the causative event, generally determines the place of the "occurrence" or "accident." The question remains whether this test should be applied in the context of deciding the applicability of a territorial exception to a war risk exclusion. We are convinced that this formula has particular efficacy in determining the reach of an exclusionary clause barring coverage for losses resulting from war.
The purpose of a war risk exclusion is to eliminate an insurer's liability in circumstances in which it is impossible to evaluate the risks. The clause effectuates this purpose by excluding coverage for claims occasioned by the special hazards of war. Military service in a war theater "is fraught with incalculable dangers." Metropolitan Life Ins. Co., 136 N.J.L. at 152, 55 A.2d 2. It is difficult to assess the scope of the risks assumed by members of the armed forces in view of modern methods of warfare, keeping in mind the potential devastation that attends the battlefield. Ibid. The risk inherent in military service waging war is not contemplated in the premiums, which are based upon civilian accident and mortality experience. See C.T. Drechsler, Annotation, Insurance-Military Service Clause, 36 A.L.R.2d 1018, 1021 (1954). It is difficult to devise an actuarial guide for properly determining the amount of premiums. Ibid. Moreover, the perils of war are so great that insurers are often reluctant to undertake such insurance risks. An insurance company clearly has the right to limit its liability for risks associated with war hazards.
Within this analytical framework, the risks of war manifest themselves in the place where the injury occurs. In determining the territorial reach of a war risk exclusion, the place where the hazard is most acute, the location where the injury takes place, should be the focal point in determining the whereabouts *232 of an occurrence or accident. In our view, this construction of the policy language comports with the contract terms, the reasonable expectations of the parties and the settled principles we have described. We are convinced that insurance consumers, whether highly knowledgeable or less sophisticated, would so interpret the policy language. We are confident that, viewed objectively, reasonable people would say that the "accident" or "exposure" resulting in injury happened in Vietnam, not in the United States. We hold that the "occurrence" which triggers the policy coverage takes place where the actual damage happens.
We recognize that the District Court reached a different conclusion in Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. 1368 (E.D.N.Y. 1988). There, Judge Weinstein held that the occurrence "was the continuous course of deliveries by Uniroyal to the government in the United States." Id. at 1390. We stress, however, that this pivotal conclusion was derived from the judge's prior finding that in determining the number of occurrences for the purpose of calculating the total amount of the deductibles, the cause of the harm was the appropriate reference point. Id. at 1380. The insured argued that the "number of occurrences" must be determined "by reference to the time and place of the ultimate injury," a proposition for which the judge found no support. Ibid.
As we pointed out earlier, we agree with Judge Weinstein that the causative event determines the "number of occurrences." It would be unseemly and unfair to aggregate the number and amounts of deductibles where a single cause results in multiple injuries. However, we disagree with the District Court, and depart from its ultimate finding, to the extent it applied the same test to the entirely different issue of determining the place where the "occurrence" happened. Id. at 1390. As to this point, we repeat that the "accident" or "exposure" occurred in Vietnam, not in the United States.
*233 We acknowledge that "[n]egligence is conduct-oriented, asking whether defendant's actions were reasonable; [and that] strict liability is product-oriented, asking whether the product was reasonably safe for its foreseeable purposes." Beshada v. Johns-Manville Prods. Corp., 90 N.J. 191, 200, 447 A.2d 539 (1982); Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 169, 406 A.2d 140 (1979). This much conceded, the principal purpose of Agent Orange, indeed, its only foreseeable use, was to wage war in Vietnam. The real question in terms of products liability, was whether Agent Orange "was reasonably fit, suitable and safe for [its] intended or foreseeable purpose[]." Suter v. San Angelo Foundry & Machine Co., 81 N.J. at 177, 406 A.2d 140. Agent Orange was an instrument of war which was effectively used in Vietnam. It was not designed to be used commercially in the United States. In "designing" and "manufacturing" the product, Diamond was obliged by our products liability law to make it "reasonably safe for its foreseeable purpose" as a weapon of war. The delivery of Agent Orange to military authorities in the United States was not an "accident" or an "occurrence" for which liability ultimately attached. The product was defective in the context of its use in war. We thus reject Uniroyal's holding that the delivery of Agent Orange in the United States constituted the "occurrence" which triggered the obligation to indemnify under the policy.
We add that the policy language construed by the District Court in Uniroyal differed substantially from that present here. "Occurrence" was defined as an "accident or a happening or event or a continuous or repeated exposure to conditions which ... results in personal injury...." Id. at 1380. This "multifold definition of occurrence" perhaps yielded interpretations which we find foreign to the policy language in this case. Id. at 1381.
We are satisfied that the geographic exception to the war risk exclusion is not applicable. We thus consider whether the *234 "occurrence" was directly or indirectly occasioned by the war in Vietnam.

b.
War risk and military service provisions generally fall into two categories, "status" or "result" clauses. See, e.g., Ingram v. Continental Cas. Co., 248 Ark. 276, 451 S.W.2d 177, 178 (1970); Coit v. Jefferson Standard Life Ins. Co., 161 P.2d 812, 813 (Cal.Ct.App. 1945), aff'd, 28 Cal.2d 1, 168 P.2d 163 (1946); O'Daniell v. Missouri Ins. Co., 24 Ill. App.2d 10, 164 N.E.2d 78, 79 (Ill. App.Ct. 1959); Myli v. American Life Ins. Co. of Des Moines, Iowa, 43 N.D. 495, 175 N.W. 631, 632 (1919); Laurendeau v. Metropolitan Life Ins. Co., 116 Vt. 183, 71 A.2d 588, 591 (1950). While a "status" clause becomes effective when the insured is a member of the military in a time of war, a "result" clause requires that the injury be causally related to a military operation or active warfare. Compare Bending v. Metropolitan Life Ins. Co., 74 Ohio App. 182, 29 O.O. 319, 58 N.E.2d 71, 72 (Ct.App. 1944), with Benham v. American Central Life Ins. Co., 140 Ark. 612, 217 S.W. 462 (1919); Long v. St. Joseph Life Ins. Co., 225 S.W. 106 (Mo. Ct. App. 1920). We construe the war risk provision in this case as a "result" clause, because it is effective only when the "liability of the assured [is] directly or indirectly occasioned by, happen[ed] through or in consequence of war."
The question before us is what degree of causal connection is required by the war risk exclusion. Our research discloses a welter of conflicting decisions bearing upon this issue. The apparent conflict is due in great measure to the difference in phraseology of the exemption clauses. See Coit v. Jefferson Standard Life Ins. Co., 161 P.2d at 814. Although war risk and military service exclusions have been in use for many years, they have not, as yet, been standardized to the degree common to other types of insurance provisions. See C.T. Drechsler, Annotation, Insurance-Military Service Clause, 36 A.L.R.2d at 1022.
*235 At the outset, we find inapposite decisions interpreting war risk policies issued by the United States government. See, e.g., Standard Oil Co. v. United States, 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68 (1950); Libby, McNeill & Libby v. United States, 340 U.S. 71, 71 S.Ct. 144, 95 L.Ed. 86 (1950); New Orleans-Belize Royal Mail & Central American S.S. Co. v. United States, 239 U.S. 202, 36 S.Ct. 76, 60 L.Ed. 227 (1915); Airlift Int'l, Inc. v. United States, 335 F. Supp. 442 (S.D.Fla. 1971). The United States began to assume the war risks of merchant vessels at the time of the Civil War. Annotation, War Risks, 340 U.S. 71, 95 L.Ed. 80 (1950). The government chartered ships under agreements wherein the owner would bear ordinary marine risks and the United States would bear a narrow set of war hazards. Ibid. During World War II and the Korean conflict, the government issued a separate policy covering war risks that were ordinarily coextensive with those excepted from the marine insurance, as including risks resulting from capture, service, arrest, restraint or detainment, and "from all consequences of hostilities or warlike operations." Ibid. Older decisions construed the words "war risk," which were apparently contained in the original charter agreements, as meaning "acts of the public enemy" or "casualties of war." See Standard Oil Co. v. United States, 340 U.S. at 65, 71 S.Ct. at 141, 95 L.Ed. at 77. (Frankfurter, J., dissenting). Although this "restrictive definition" was eschewed in later cases dealing with interpretation of the phrase "all consequences of hostilities or warlike operations," the Supreme Court was understandably reluctant to significantly expand the nature and type of risks covered. Ibid. The Court developed the following formulation:
Losses from collisions are prima facie perils of the sea covered by standard marine risk policies. To take such a loss out of the marine policy and to bring it within the coverage of the provision insuring against "all consequences of" warlike operations, common sense dictates that there must be some causal relationship between the warlike operation and the collision.... In turn, the existence or non-existence of causal connection between the peril insured against and the loss has been determined by looking to the factual situation in each case and applying the concept of "proximate cause." Proximate cause in the insurance field has been variously defined. It has been said that proximate *236 cause referred to the "cause nearest to the loss." Again, courts have properly stated that proximate cause "does not necessarily refer to the cause nearest in point of time to the loss. But the true meaning of that maxim is that it refers to that cause which is most nearly and essentially connected with the loss as its efficient cause."
340 U.S. at 57-58, 71 S.Ct. at 137-38, 95 L.Ed. at 73 (footnotes omitted).
In our view, this formulation is far too restrictive in construing the war risk clause in this case. We reach this conclusion for several reasons. First, war risk coverage under the charters and policies in question in Standard Oil Co. and its progeny was intended to guard against a narrow category of hazards. Essentially, this coverage was designed to fill the gap caused by the initial unwillingness of private companies and ship owners to either insure or bear such devastating risks. Although private insurers ultimately agreed to undertake such risks, see Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402 (1924); Muller v. Globe Rutgers Fire Ins. Co., 246 F. 759 (2d Cir.1917), war coverage provisions had their historical roots in government's attempt to secure ships for use in war, a use not generally covered by marine insurers. Second, war coverage provisions were intended to be co-extensive with the risks excepted from ordinary marine insurance policies. Because maritime policies effectively covered losses resulting from perils of the sea, war risk coverage was designed to protect against a narrow set of risks inherent or closely connected with warlike hostilities or belligerency.
Third, and most important, the exclusionary language in this case is extremely broad, and bears little or no resemblance to that interpreted in Standard Oil Co. The words are crystal clear. We cannot imagine a phrase or series of phrases more descriptive in communicating the nature of the risks excepted from policy coverage. Unlike the provision construed in Standard Oil Co., we discern no design on the part of the contracting parties to impose the subtleties of tort liability concepts on the kaleidoscope of potential war-related risks. We are not *237 concerned here with liability imposed by law. Instead, our function is to construe and enforce the engagement bought and paid for by Diamond. The exclusionary language was intended to reflect the practicalities of commercial dealings. The parties did not intend to "play an unreal metaphysical game" of trying to find a single isolatable factor as the sole reason for the injuries sustained. Standard Oil Co. v. United States, 340 U.S. at 66, 71 S.Ct. at 141-42, 95 L.Ed. at 78. As a matter of experience and reason, such losses are invariably the result of a combination of factors. Recognizing this fact, the drafter of the clause used the words "directly or indirectly," "occasioned by," "happening through" or "in consequence of" war. Simply put, we find no basis for the Chancery Division's conclusion that the exclusion was intended to be confined to injuries caused by one human being, "hostile to another," "striking out" at the other individual. To the extent that Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. at 1391, fosters the conclusion reached by the Chancery Division judge, we respectfully disagree. Considering the inevitable treacheries of language, we are of the view that the Chancery Division's interpretation fails to shield the insurers from a risk they expressly said they would not undertake.
As we said earlier, New York law is applicable. While we have found no reported New York opinion directly on point, that state's highest court has interpreted a similarly worded clause. In Neidle v. Prudential Ins. Co. of America, 299 N.Y. 54, 85 N.E.2d 614 (1949), the exclusionary clause in question provided that double indemnity benefits were excepted when the "death [of the insured] resulted ... from participating ... in military or naval service in time of war." Id. at 615. Chief Judge Fuld, writing for the Court of Appeals, construed the clause as a "result" and not a "status" provision, because "it require[d] a causal link between military service and the insured's death." Ibid. In determining the requisite degree of causality between military service and death, the Court formulated a test that is highly instructive. Specifically, the Court *238 said, "[t]he proviso, given fair and reasonable construction, encompasses those cases where death results from an accident made more probable and more likely by the demands and hazards of military service." Ibid. The Court went on to note that the exclusionary clause was applicable "[i]f the fatal hazard was one incidental to military [service]." Ibid. See also Goodrich v. John Hancock Mut. Life Ins. Co. of Boston, Mass., 17 A.D.2d 271, 234 N.Y.S.2d 587 (App.Div. 1962).
We recognize that Neidle involved a military service provision, not a war risk exclusion. However, the test applied by the Court in deciding the necessary degree of causality is equally valid in the context of a war risk exception. In terms of the war risk exclusionary language at issue here, inquiry should focus upon whether the injury "resulte[d] from an accident made more probable and more likely by the demands and hazards of [war]." Neidle v. Prudential Ins. Co., 299 N.Y. at 56, 85 N.E.2d at 615. If the "hazard was one incidental to war," it must be said to fall within the exclusion." Ibid.
Although the cases are by no means uniform, this test or its equivalent has been applied by other jurisdictions. See, e.g., Hooker v. New York Life Ins. Co., 161 F.2d 852 (7th Cir.), cert. denied, 332 U.S. 809, 68 S.Ct. 109, 92 L.Ed. 386 (1947); International Dairy Eng. Co. of Asia, Inc. v. American Home Assur. Co., 352 F. Supp. 827 (N.D.Cal. 1970), aff'd, 474 F.2d 1242 (9th Cir.1973); Eggena v. New York Life Ins. Co., 236 Iowa 262, 18 N.W.2d 530 (1945); Selenack v. Prudential Ins. Co. of Am., 160 Pa.Super. 242, 50 A.2d 736 (Super.Ct. 1947); Hazle v. Liberty Life Ins. Co., 257 S.C. 456, 186 S.E.2d 245 (1972). In these cases, the courts have looked to the nature of the accident to determine whether it was made more probable and more likely by the demands and hazards of war. Significant in the context of the issue presented here is the fact that the courts have consistently applied war risk exclusions even where the injuries were not sustained in actual combat.
*239 In International Dairy Eng. Co. of Asia, Inc. v. American Home Assur. Co., for example, the policy covered fire loss of the insured's property while in warehouses or processing plants. 352 F. Supp. at 828. The policy excluded coverage for "the consequences of hostilities or warlike operations" and excluded fire damage which was "caused directly ... by a hostile act by or against a belligerent power." Ibid. The insured was the operator of a milk processing plant near Saigon. The fire occurred when an aerial parachute flare was dropped on the plant. Such flares were used to illuminate areas for the purpose of detecting and destroying infiltrators. The District Court held that the loss fell within the war risk exclusion. Id. at 830-31. In reaching this conclusion, the court reasoned:
It has ... been held that the hostile act need not involve the overt use of a weapon which is in itself, capable of inflicting harm; it can be an operation such as the extinguishment of a navigational light or the outfitting of a ship  if done for a hostile purpose. (Id. at 829).
* * * * * * * *
Although flares are not themselves weapons designed to destroy or harm, all of the purposes for which flares were being used in Vietnam ... would be "hostile acts" by a belligerent in the sense that all those purposes involved use of flares in conjunction with weapons capable of firepower and to expose enemy forces to that firepower. (Ibid.).
* * * * * * * *
The flare was obviously dropped in connection with military operations against these insurgent, rebellious Viet Cong and in our opinion the loss was a consequence of civil war, revolution, rebellion, insurrection, and civil strife within the meaning of the policy. (Id. at 831).
In Hooker v. New York Life Ins. Co., the insured's estate sued for double indemnity benefits. The policy contained an exclusion barring such benefits "if the insured's death resulted, directly or indirectly, from ... war or any act incident thereto." 161 F.2d at 852. In a military training exercise in New Zealand during World War II, the insured fell over a cliff while attempting to make his escape from "enemy" forces. The insured's estate argued that the war risk exclusion only encompassed *240 activities inherent in the "conflict or hostilities." Id. at 854. The Court of Appeals for the Seventh Circuit was unpersuaded,
[W]e think there is no escape from the conclusion that the insured's death resulted from "war or an act incident thereto." To think, as plaintiff would have us do, that war as used and intended by the parties was confined to combat service is to attribute to the word a meaning that is unnatural and unreal. Combat service is only the culmination of the myriad separate and independent acts all of which are an essential part of war. When a person enters the military service of his country which is engaged in war with an enemy country, every act performed in training and preparation for actual combat service under the command of military authority is a necessary and essential part of the war.... [A] soldier's engagement in such war cannot logically be made to depend upon a situation either in time or distance to the point where bullets are being exchanged with the enemy. (Id. at 856-57).
* * * * * * * *
The insured was in New Zealand because of war and his activities were because of war and a part of war. The activities in which he was engaged and which resulted in his death were in no wise common to a civilian. (Id. at 857).
A similar result was reached in Eggena v. New York Life Ins. Co. There, the insured was killed in a tank accident. The tank overturned while participating in a routine training convoy during World War II. The insured's estate sought coverage under the policy, which was denied by reason of the same war risk exclusion quoted in Hooker, 161 F.2d at 852. The Supreme Court of Iowa affirmed. Eggena v. New York Life Ins. Co., 18 N.W.2d at 534. The Court distinguished cases in which "[v]arious courts have held that the war clause is not applicable where death is due to some cause common to both military service and civilian life." Id. at 533. The Court stressed, however, that the insured's accident was "peculiar to military service, or to war, or [was] an incident of war." Ibid.
Here, deceased came to his death riding in an army tank as a member of a crew in training for war, which is not a cause of death common to civilian life. A clause excluding liability in the event death results directly or indirectly from war, we are satisfied, must apply to a member of the military forces, ... on active duty, while in the line of duty, acting under orders from superior officers and carrying out a military assignment as part of his training during the prosecution of war. The death of insured was the direct result of an act incident to war. The least that could be said about a death under such *241 circumstances would be that it was an indirect result and the exemption of liability provided by the war clause would apply.
Id. at 534.
The same principles were applied in Selenack v. Prudential Ins. Co. of Am., although they yielded the opposite result. In a peacetime training demonstration, the insured's tank overturned and slid down an embankment. The carrier disclaimed liability, contending that coverage was excluded under a war risk exception similar to that in Hooker and Eggena. In finding that the exclusion was inapplicable, the court emphasized that the special hazards of war were not present in a peacetime training mission. 160 Pa.Super. at 246-47, 50 A.2d at 738. In other words, the death was said to result not from an accident made more probable or more likely by the special perils of war. Ibid. The court observed:
What is important is that defendant limited its liability by excluding death resulting from military or naval service in time of war. There is good reason for an insurer to differentiate military service in time of war, from such service in peacetime, and to assume liability for death from accident in the latter service and exclude it in the former. One is much more liable to injury and death, by accidental means, from military training and other service in time of war than from like service at other times. The stepped-up tempo of the intensive effort in time of war increases the risk, not only on aviation fields but in the training of amphibian or landing forces and others, including the crews of armored tanks. The training of officers to command such tanks was essential to the war effort. Insured was engaged in military service while in command of the tank, driven in convoy, though on a routine training maneuver. The parties had the right to contract against the increased hazards of military service in time of war, without affecting insurer's liability for accidental benefits from death in like service in time of peace. There is nothing in the clear language of the clause which will permit a construction limiting the exclusion to actual combat service. Death resulting from military service in time of war comprehends death in actual combat but is not so restricted as to exclude death under other circumstances, if actually resulting from military service, in time of war.
Id. at 738-39.
Applying the principles distilled from these decisions, we reach the inescapable conclusion that the "liability of the assured [was] directly or indirectly occasioned by, happen[ed] through or [was] in consequence of war." We need not recite *242 in detail the evidence that supports this determination. Suffice it to say, the record admits of no other conclusion.
Agent Orange was not a commercial product. It was not sold to commercial users. Rather, it was manufactured according to specifications developed by the United States government specifically for the war effort in Vietnam. The record fairly shrieks of evidence that Agent Orange was a "novel weapon of war," an instrument designed to aid the defeat of the enemy. It was used to destroy Vietcong food supplies and defoliate the jungles to permit detection of enemy forces and a clear line of fire. The safety considerations that come into play under peacetime conditions simply did not apply. Unlike commercially used products which are invariably diluted, Agent Orange was applied at full strength. Moreover, the exigencies of war further compounded the increased dangers already inherent in the Agent Orange specifications. Higher concentrations often would be found because of double spraying, drifts, miscalculations, and the sudden jettisoning of the product by aircraft in order to avoid enemy fire.
In the words of Neidle v. Prudential Ins. Co., liability "result[ed] from an accident made more probable and more likely by the demands and hazards of [war]." 299 N.Y. at 56, 85 N.E.2d at 615. Since the hazard was "incidental to war" and not common to civilian life in peacetime, we find it abundantly plain that the war risk exclusion was applicable.

c.
In the course of this appeal, Diamond has urged us to construe the war risk clause in what we perceive to be a hypertechnical sense wholly divorced from reality. In pursuing their respective positions, all the parties at different points have asked us to apply various "constructional aids," some as dated and as irrelevant as Roman law. We do not fault counsel. Their work in this case has been of the highest caliber. Nevertheless, it bears emphasis that the law should be more than a collection of Latin phrases and literalisms. Instead, it should *243 meet and serve the legitimate expectations and goals of common, ordinary citizens.
In this light, it would come as quite a shock to the thousands of individuals who served in Vietnam and were exposed to Agent Orange that the pain they now endure is not to be regarded by the law as a consequence of their experience in that war. To those more fortunate who do not bear these scars, the answer must be the same.
We recognize that the fight here is not whether veterans should be paid for the injuries they sustained in service of their country. Rather, the dispute is over who is obliged to pay this just debt. In the insuring agreement, the parties have effectively resolved that question. We do no more than honor their choice. We hold that the veterans' injuries were "occasioned by" or constituted a "consequence" of the war in Vietnam and that Diamond's liability fell squarely within the purview of the war risk exclusion.

2.
Because the war risk exclusion does not appear in all of the policies, we address the remainder of the issues raised in the cross-appeal.
We first consider the insurers' argument that Diamond failed to establish that the veterans suffered bodily injury. This issue had its origin in motions filed by the American Re-Insurance Company, other excess providers, and the London Market Insurers. They asserted that there was no credible, scientific evidence which linked dioxin to either bodily injury or property damage. These insurers contended in the Chancery Division, and continue to argue here, that Diamond failed to prove an occurrence which caused bodily injury.
In denying these motions, the Chancery Division emphasized that the veterans' Agent Orange claims raised serious issues concerning whether their exposure to dioxin created enhanced risks of devastating injuries. Cf. Ayers v. Jackson Tp., 106 *244 N.J. 557, 591-92, 525 A.2d 287 (1987). The court observed that there was a plausible basis for Diamond's concern that it would be found responsible. The Chancery Division noted that the settlement was negotiated by sophisticated attorneys based upon substantial scientific data, and that Diamond had acted "reasonably" and "sensibly" in entering into the agreement. The court stressed that the insurers had been notified of the litigation and had been "given some opportunity" to participate. These circumstances were said to compel the conclusion that the insurers were bound by the settlement.
We agree with the Chancery Division's disposition of this issue. We do not have all of the relevant insurance policies before us. We have been given the policy issued by American Re-Insurance Company. There is no suggestion that any of the other policies contained language at odds with that provided by American Re-Insurance. The applicable provisions read in pertinent part:
[The excess providers agree] to indemnify the Assured for any and all sums which the Assured shall by law (including liability assumed by the Assured under contract or agreement) become liable to pay and shall pay or by final judgment be adjudged to pay on account of Personal Injuries including death at any time resulting therefrom and/or Property damage as hereinafter defined arising out of occurrences happening during the contract period anywhere in the World....
* * * * * * * *
Liability under this Policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying Insurers, shall have paid or have been held liable to pay the amount of underlying limit on account of such occurrence. The Assured shall make a definite claim for any loss for which the Company may be liable under the Policy within Twelve (12) months after the Assured shall have paid an amount of Ultimate Net Loss in excess of the amount of the underlying limits or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant and the Company....
In our view, the text of these provisions strongly militates in favor of the Chancery Division's conclusion. We construe these clauses as meaning that a liability incurred by reasonably settling a case is a covered loss so long as the claim settled *245 would itself have been a covered loss. Our interpretation of these clauses comports with that given to similar provisions by Judge Weinstein in Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. at 1378.
Other considerations militate in favor of this view. The insurers' contention would place settling defendants in the "hopelessly untenable" position of being forced to refute liability in the underlying action until the moment of settlement, and then of "turning about face" to prove liability in the insurance action. Ibid. Such a rule would markedly diminish the advantages of settling. Faced with the choice of defending the tort action vigorously or settling it without a realistic hope of insurance reimbursement, insureds would generally take the safer former course.
Finally, we find, as did Judge Weinstein, that New York law is "clear," and provides that a "reasonable settlement binds the insurer to indemnify." Ibid. See Horn Const. Co., Inc. v. M.T. Security Service Corp., 97 A.D.2d 786, 468 N.Y.S.2d 415 (App. Div. 1983); Feuer v. Menkes Feuer, Inc., 8 A.D.2d 294, 187 N.Y.S.2d 116 (App.Div. 1959). Applying New York law, the Second Circuit was similarly convinced and expressly rejected the insurers' position. The court stated:
In order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party with whom it has settled "so long as ... a potential liability on the facts known to the [insured is] shown to exist, culminating in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured]."
Luria Brothers & Co., Inc. v. Alliance Assurance Co., Ltd., 780 F.2d 1082, 1091 (2d Cir.1986) (citation omitted) (ellipses and brackets in original). Accord, Dayton Independent School District v. National Gypsum Co., 682 F. Supp. at 1406-07 (applying New York law) ("A [settling] policyholder, therefore, does not have to prove its actual liability as a prerequisite to obtaining coverage."). But see Servidone Construction Corp. v. Security Ins. Co. of Hartford, 64 N.Y.2d 419, 488 N.Y.S.2d 139, 477 N.E.2d 441 (1985) (requiring that the claim settled be a *246 "covered loss" under the policy). We note that the principle expressed by the Second Circuit in Luria is consistent with New Jersey law. Compare Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartford, 72 N.J. 63, 73, 367 A.2d 864 (1976) with Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 28, 483 A.2d 402 (1984).
We also reject the insurers' contention that the Chancery Division misconstrued the "batch clause" contained in Aetna's policy. The batch clause appeared in the section of Aetna's policy entitled "Limits of Liability," and provided with respect to products liability damages, "all such damages arising out of one lot of goods or products prepared or acquired by the named insured or by another trading under his name shall be considered as arising out of one accident." This provision was found in Aetna's policies issued between 1955 and 1966. In 1967, when Aetna changed to an occurrence-based policy, an endorsement was added, reciting that:
it is agreed that Item III limits of liability under the CGL part are amended to include the following as respects products liability for bodily injury and property damage coverage:
All such damage arising out of one lot of goods or products prepared or acquired by the named insured or by another trading under his name shall be considered as arising out of one occurrence.
The insurers contended below, and argue here, that the batch clause operated to make each of the 133 lots delivered to the military a single occurrence. In rejecting this contention, the Chancery Division determined that this provision was intended to apply only to manufacturing defects, and not to design errors.
Although the policy language, on its face, contains no such limitation, we agree with the Chancery Division's interpretation of the clause. We have found no reported decision dealing with this precise question. The batch clause was mentioned, however, in Home Ins. Co. v. Aetna Cas. & Sur. Co., 528 F.2d 1388 (2d Cir.1976). There, the carrier sought a declaratory judgment to determine the extent of its liability to Diamond in a case where two lots of defective superconcentrated Vitamin D-3 *247 resin were produced. These lots were shipped to Diamond's Kentucky plant where they were made into four lots of a livestock food supplement. This product was sold to a company that made chicken feed. The chicken feed was sold to farmers and because of its contamination, sickened and killed numerous animals. Home maintained that there were four occurrences, and Diamond asserted there were only two. The District court granted Home's motion for summary judgment. The Second Circuit reversed, finding factual issues concerning both the meaning of the batch clause and the intent underlying its incorporation into the policy. Id. at 1390. Although the insurers contend that Diamond is bound here by the position it took in Home Ins. Co., we find no basis for this argument. In any event, the facts are not comparable, and we find Home Ins. Co. unhelpful in resolving the issue before us.
We recognize that the issue is reasonably debatable. However, one point is indisputable. The intent of the parties in adding the batch clause to the policies was to minimize the number of occurrences in order to maximize coverage. If the batch clause is interpreted to require aggregation of deductibles to correspond with the number of lots distributed, it will run counter to the parties' intent. On the other hand, although the language of the batch clause makes no distinction between manufacturing and design defects, the Chancery Division's interpretation of the provision is consistent with the purpose of the clause and the parties' understanding.
While the question is far from clear, we choose the interpretation of the contractual language that best advances the purpose of the clause and comports with the parties' intent. We are convinced that the clause should be applied only where the product manufactured is nonconforming, not where the product is consistent with a faulty design. The equation of "lots" and "occurrences" is consistent with the idea that the clause is designed to prevent the stacking of deductibles where manufacturing errors have taken place. The Chancery Division's construction of the clause also comports with the rationale *248 of the cases we cited previously, referring to the cause of the injury in defining the number of occurrences. See, e.g., Doria v. Ins. Co. of N. Am., 210 N.J. Super. at 69, 509 A.2d 220. We thus agree with the Chancery Division's conclusion.
The excess providers contend that the Chancery Division erred in finding Diamond's foreign liability insurers not liable for the Agent Orange claims. It appears that we do not have before us all of the foreign risk policies. They apparently cover occurrences which happen during the policy period within the countries listed. We assume that Vietnam was one of the countries covered. Although the Chancery Division's decision on this point was somewhat ambiguous, the court seemingly found that because the occurrence happened in the United States, the foreign risk policies were not implicated. The question reduces itself to a determination of where the covered occurrence actually took place, in the United States, where the delivery was made to the military, or Vietnam, where the Agent Orange claimants were exposed to the dioxin-laden product. This, of course, harkens back to our earlier discussion of the issue, where we held that the occurrence happened in Vietnam.
Because we are unsure whether all of the foreign risk policies have been supplied to us and whether the ones appearing in the appendices are representative of others, we are of the view that the matter should be remanded to the Chancery Division for reconsideration in light of our holding that the occurrence happened in Vietnam. These policies should be closely examined to determine whether, under their terms, they are applicable. If the foreign risk insurance policies are deemed to cover these occurrences, the amounts that would be available, but for Diamond's failure to provide timely notice, must be deducted from the obligation of the excess providers.
We are in accord with the Chancery Division's determination that the insurers are entitled to interest. We note that, unlike New Jersey, New York permits interest as part of a settlement. Compare Kotzian v. Barr, 81 N.J. 360, 366, 408 *249 A.2d 131 (1979); Willts v. Eighner, 168 N.J. Super. 197, 200, 402 A.2d 269 (Law Div. 1978); Sylvia B. Pressler, Current N.J. Court Rules, R. 4:42-11(b) Comment (1992), with Dietrick v. Kemper Ins. Co., 76 N.Y.2d 248, 557 N.Y.S.2d 301, 305, 556 N.E.2d 1108 (1990); Bethlehem Steel Corp. v. Youngstown Cartage Co., 79 A.D.2d 902, 434 N.Y.S.2d 241, 242 (App.Div. 1981). In his written opinion, the Chancery Division judge held that the amount paid by Diamond as its share of the Agent Orange settlement should be allocated among the various insurers and policies in force by dividing that number by the total amount of gallons of Agent Orange delivered to the military. This would provide the monetary loss to Diamond per gallon. With respect to interest on the judgment, the court decided:
The defendants shall be responsible for interest on the amount of $23,339,417.36 in proportion to their responsibility for the principal amount. Interest shall run from the date of payment of the Agent Orange settlement by Diamond until Diamond is paid by the defendants. Interest on any funds actually borrowed by Diamond to make the settlement payment shall be equal to the interest actually paid by Diamond. Interest on unborrowed funds used by Diamond in making the payment shall be at the prime rate in force from time to time between the settlement payment date and the date of payment by defendants at Diamond's principal bank in New York City.
The court subsequently modified its determination in various particulars that have no bearing to the issues raised here. In any event, the court ordered that interest be computed from the date Diamond paid its share of the Agent Orange settlement, January 14, 1985. Although no distinction was made, interest that accrued between that date and the date of the Chancery Division's decision, April 12, 1989, was denominated prejudgment interest.
The insurers contend that interest is not payable if the policy has exhausted its limits in reimbursing the insured. In other words, the insurers argue that their liability is limited to paying the "ultimate net loss," which is defined as:
(i) the total sum which the Assured or any Company as his Insurer, become obligated to pay by reason of personal injury or injury to or destruction of property, including the loss of use thereof, either through adjudication or compromise, and

*250 (ii) shall also include hospital, medical and funeral charges, and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Named Assured's or of any underlying Insurer's permanent employees....
The Companies shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance.
Stripped to its essentials, the insurers' contention is that this language, which includes "interest," means that they can be liable only insofar as payment on principal and interest comes within the policy's monetary limits.
We disagree. The interest referred to in the term "ultimate net loss" is interest which is "paid as a consequence of any occurrence covered hereunder." It is plain from the context of the provision that the interest cost referred to is that incurred in the underlying action for which coverage is provided. In contrast, the prejudgment interest awarded by the Chancery Division was a consequence, not of the underlying covered occurrence, but of the insurers' failure to pay the sum for which Diamond was liable and which Diamond paid in January 1985.
However, we modify the award of interest in one particular. The policies issued by the excess providers state that a loss is payable only if certain conditions are met. Specifically,
[l]iability under this Policy with respect to an occurrence shall not attach unless and until the Assured, or the Assured's underlying Insurers, shall have paid or have been held liable to pay the amount of underlying limit on account of such occurrence. Assured shall make a definite claim for any loss for which the Company may be liable under the Policy within Twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount of the underlying limits or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the Claimant and the Company.... Such losses shall be due and payable within Thirty (30) days after they are respectively claimed and proven in conformity with this Policy.
According to this provision, the excess insurers owed no duty to Diamond under their policies until the primary insurers *251 either "paid" or were "held liable to pay" the entire primary policy limit. At the time that Diamond paid its share of the Agent Orange settlement, there had been no adjudication of the primary insurers' liability. Diamond had not been paid to the limits of its primary policies. While it is true that Diamond lost the use of its money once it paid its share of the settlement, the obligation of the excess providers had not been triggered, because the primary policies had not been exhausted and there was no adjudication of the primary insurer's responsibility to pay the policy limits. Our concern is not that the amount owed by the excess carriers was unliquidated. See Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 478, 541 A.2d 1063 (1988); Ellmex Constr. Co., Inc. v. Republic Ins. Co., 202 N.J. Super. 195, 210, 494 A.2d 339 (App.Div. 1985), certif. denied, 103 N.J. 453, 511 A.2d 639 (1986). Instead, the problem we perceive is that the excess providers' responsibility was not triggered under the policy terms until April 12, 1989. At that point, the date of the Chancery Division's determination, the liability of the primary insurer was adjudicated and the amount of available primary coverage was determined. That event triggered the excess providers' responsibility under the policy terms. We hold that interest should run from that date.
The judgment of the Chancery Division is affirmed in part and reversed in part. The matter is remanded for further proceedings consistent with this opinion.